**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHAEL HUDSON, derivatively on behalf of Nominal Defendant TILRAY BRANDS, INC., | Case No. |
| Plaintiff, | **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| BRENDAN KENNEDY, MARYSCOTT GREENWOOD, CHRISTINE ST.CLARE, MICHAEL AUERBACH, REBEKAH DOPP, IRWIN D. SIMON, RENAH PERSOFSKY, JODI BUTTS, DAVID CLANACHAN, JOHN M. HERHALT, DAVID HOPKINSON, and THOMAS LOONEY, | |
| Defendants, | |
| - and - | |
| TILRAY BRANDS, INC., | |
| Nominal Defendant. | |

Plaintiff Michael Hudson ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Tilray Brands, Inc. ("Tilray" or the "Company"), against: (i) former members of its Board of Directors (the "Board") Brendan Kennedy ("Kennedy"), Maryscott Greenwood, Christine St.Clare, Michael Auerbach, and Rebekah Dopp; and (ii) current Board members Irwin D. Simon, Renah Persofsky, Jodi Butts, David Clanachan, John M. Herhalt, David Hopkinson, and Thomas Looney (collectively, the "Individual Defendants," and together with Tilray, the "Defendants") for breaches of fiduciary duties, unjust enrichment, and waste of corporate assets, and violations of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff's allegations are based upon personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation

1

and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Tilray with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## I.    INTRODUCTION[1]

1.      This is a stockholder derivative action brought for the benefit of nominal defendant Tilray against the Individual Defendants, all of whom are current or former officers and/or directors of Tilray, based on their non-exculpable breaches of fiduciary duty and other serious misconduct from the time of the Company's initial public offering (the "IPO") in July 2018 through March 2020 (the "Relevant Period"), as alleged in detail herein.  This Action largely concerns two categories of false statements made by the Individual Defendants during 2019 and 2020. The first category of false statements relates to the value of Tilray's inventory and its gross margins. The second category of false statements relate to the entrance into, and the value of the Company's agreement with Authentic Brands Group ("ABG").

2.      In 2011, defendant Kennedy, Michael Blue, and Christian Groh (together, the "Kennedy Group") founded Privateer Holdings, Inc. ("Privateer") in order to invest in the nascent cannabis industry. In 2014, Tilray's predecessor company was formed as a subsidiary of Privateer by way of hundreds of millions of dollars from outside investors.

3.      In July 2018, Tilray conducted the IPO, through which it issued roughly 9 million new shares of Class 2 stock. Following the IPO, Privateer emerged with an 82% ownership stake in Tilray and 93% voting power over Tilray's management. In addition, pre-IPO investors also

---

[1]      All emphases are added. All quotations from written sources with Canadian or UK spelling have been edited to American spelling.

emerged with a 9% economic interest in Tilray. These investors, along with Privateer, consented to a six-month "lockup" agreement by which they agreed not to sell their shares until January 2019. At all relevant times, defendant Kennedy and his partners held voting control over Privateer and by extension, Tilray.

4.     In January 2019, that lockup on the remaining 10% expired and the shares were freely tradeable. Adding only 10% of Tilray's shares to its float caused its stock price to fall 17% in one day. To keep Tilray's stock price from falling further and to secure additional benefits, defendant Kennedy, with the apparent acquiescence of Tilray's Board, caused Tilray to enter into, and touted, a purported co-branding deal with ABG, one of the world's largest brand owners (the "ABG Agreement").

5.     Under the terms of the ABG Agreement, ABG acquired a significant stake in Tilray, and the two companies agreed to work together to develop and expand Tilray's portfolio of cannabis-based consumer brands. ABG also agreed to provide Tilray with access to its expertise and resources in brand management, marketing, and distribution. The partnership between Tilray and ABG was seen as a significant move for the cannabis industry, as it represented a major investment by a well-established brand management company in the growing market for cannabis-based consumer products. The partnership aimed to help Tilray develop and bring to market new cannabis-based consumer products and to expand its reach and visibility in the global market.

6.     Defendant Kennedy claimed that the ABG Agreement was a strategic masterstroke that followed long discussions between Tilray and ABG, culminating in a month of intense negotiations. Defendant Kennedy claimed that the ABG Agreement was worth more than the $100 million Tilray had paid for it, and Tilray's financial statements carried the ABG Agreement at the full consideration Tilray paid for it. Defendant Kennedy also told Tilray stockholders that ABG

had vetted Tilray and, by conferring its seal of approval, showed Tilray had a great deal to offer leading brands.

7.      In truth, defendant Kennedy and Tilray's other representative had spent mere days negotiating, and conducting due diligence for, the ABG Agreement. According to the account of one former employee cited in the Securities Action,[2] defendant Kennedy caused Tilray to enter into the ABG Agreement for one main reason: to "prop up Tilray's stock [price]." Tilray's own branding experts protested that the ABG Agreement offered far less to Tilray than what the Company had paid for it. And ABG had not vetted Tilray; Tilray had effectively driven a truck full of money to ABG's headquarters and demanded so little in return that ABG would have been crazy to refuse.

8.      Defendant Kennedy needed to do more to convince stockholders of Tilray's stability. Young companies like Tilray are often judged by their gross margins, which essentially measures the portion of revenues that are not spent producing and selling the goods sold. Companies easily achieve economies of scale on overhead, but it is far more difficult to reduce unit costs or increase their sale price. Yet in the two quarters after its IPO, Tilray's gross margins had fallen from 55% to 31%, raising doubts about whether Tilray could survive in a fiercely competitive field. To allay stockholders' concerns, there is evidence that, under the direction of defendant Kennedy (aided by Mark Castaneda ("Mr. Castaneda")[3] and the Board), Tilray recognized more than $40 million of unsellable marijuana plant waste as valuable inventory and

---

[2]      The "Securities Action" is the pending securities fraud class action against Tilray captioned *Kasilingam v. Tilray, Inc*., et al., Civil Action No. 20-cv-03459 (PAC) (S.D.N.Y.).

[3]      Mr. Castaneda served as Tilray's Chief Financial Officer ("CFO") from March 2016 until approximately January 14, 2020.

subtracted the $40 million from Tilray's cost of sales. This had the effect of improving Tilray's margins, and making it seem far more profitable and promising than it really was.

9.      In his attempt to bolster Tilray's future business prospects, defendant Kennedy made these false and misleading statements with the apparent goal of securing personal voting control over Tilray. Defendant Kennedy and two long-time friends ("Controlling Shareholders") control Privateer through super voting Privateer shares. In turn, Privateer owns most of Tilray's ordinary Class 2 shares, but it controls Tilray by holding all of its super voting Class 1 shares, which collectively hold more votes than all the Class 2 shares put together. Thus, the Controlling Shareholders indirectly control Tilray.

10.     The Controlling Shareholders needed the votes of Privateer's other shareholders to secure personal control over Tilray. To avoid flooding the market with new freely tradable Privateer shares, the Controlling Shareholders also had to get Privateer's other shareholders to agree to a two-year lockup. The Controlling Shareholders were asking a lot. A two-year lockup of shares in a volatile company in a nascent industry is risky. Ultimately, defendant Kennedy succeeded and was able to convince the other Privateer shareholders to agree to the Share Exchange.

11.     Defendant Kennedy had previously told reporters and Tilray stockholders that the cannabis market was in its infancy and would reach sales of $200 billion per year. Defendant Kennedy had told them, too, that just like in the beer industry, that $200 billion market would be dominated by three or four giant companies. Defendant Kennedy was ruthless in his quest to ensure that Tilray would be among the three or four giant cannabis companies left standing.

12.     *First*, defendant Kennedy, with the apparent acquiescence of the Board, overstated Tilray's inventory to exaggerate Tilray's gross margins, a "critical metric" which made the

Company appear more profitable than it was. When asked about the market for CBD in the United States, Mr. Castaneda said, "we're modeling pretty conservatively for 2020 for US CBD. Until we have that regulatory change, we are not going to adjust our numbers up." Defendant Kennedy also claimed Tilray was "building inventory". Despite these assurances of the Company's "conservative" modeling, Tilray's SEC filings indicated significant growth in its inventory. According to Tilray's SEC filings, Tilray's reported inventory grew from $16.2 million at the end of 2018, to $48.7 million after the first quarter of 2019, to $75.3 million halfway through 2019, and ultimately $111.5 million at the end of the third quarter of 2019.

13. According to the allegations in the Securities Action, this growth was a farce. The Securities Action alleges that Tilray overvalued "worthless" trim -- materials left over after harvesting the buds and flowers of the cannabis plant -- and other unsellable formulated oils. The operative Securities Action complaint cites one former employee's recollection of "bags and bags, and boxes and boxes of end-of-run materials," materials which were not given a defined internal value but ascribed a value on Tilray's financial statements of over $40 million. The Securities Action plaintiffs allege there was "no way to sell" these materials and "Tilray should have classified them as waste." The Securities Action quotes another former employee who stated that defendant Kennedy valued worthless, non-reusable oils between $750,000 and $7,500,000.

14. All told, defendant Kennedy (with the apparent acquiescence of the Board) allegedly inflated the value of Tilray's inventory by over ***$68 million*** throughout the Relevant Period, until March 2, 2020, when the Company accurately wrote down 44% of its total inventory.

15. Tilray's public filings state that, "[n]et realizable value is defined as the estimated selling price in the ordinary course of business, less reasonably predictable costs of completion, disposal and transportation." In reality, by ascribing value to trim unrelated to "the ordinary course

6

of business," defendant Kennedy, Mr. Castaneda, and the Board allegedly violated Generally Accepted Accounting Principles ("GAAP"). Similarly, the unsellable oils were allegedly given a false value, in violation of GAAP, and their true value was only reflected once inventory was written down on May 11, 2020. At this time, defendant Kennedy said that the inventory was written down "so everything that we sell will have all the cost structure associated with it so that we don't have any write-offs at the end of the year." This statement constitutes defendant Kennedy's *admission* of GAAP violations, because the inventory should have always had the correct cost structure.

16.     **Second**, even as defendant Kennedy pushed through the Share Exchange, he was negotiating a merger with Aphria, a cannabis company almost equal to Tilray's size. In a February 2020 draft Letter of Interest, defendant Kennedy offered Aphria attractive terms meant to close the deal quickly. The offer barely attached any premium to Tilray shares, despite its historically higher valuation. But defendant Kennedy insisted on one term: he would be the combined company's CEO.

17.     Having secured personal control over Tilray, and facing Aphria's impending merger-related due diligence, defendant Kennedy disclosed the truth in January 2020 and announced that Tilray had renegotiated the ABG Agreement. The new deal was drastically smaller. Then in March 2020, Tilray wrote down 86% of the value of the ABG Agreement.

18.     As previously written, the ABG Agreement essentially specified that Tilray would pay ABG $100 million and $150 million in future consideration in exchange for ABG's services globalizing the Tilray brand.

19.     Defendant Kennedy made several statements trumpeting the value of the ABG Agreement. He was quoted in a news article commenting that the ABG Agreement arose because

"[ABG] liked [Tilray's] focus on research and science, and when the U.S. Farm Bill passed [on December 20, 2018], things started coming together."  Defendant Kennedy also highlighted the "vetting  process" the companies underwent and the ABG Agreement's "first of its kind" nature. Tilray's quarterly filings on SEC Form 10-Q and related earnings conference calls also reflected high hopes for the Agreement. Tilray's first financial statement after the ABG Agreement (Tilray's SEC Form 10-Q for Q1 2019) recorded that the ABG Agreement was worth over $151 million. Defendant Kennedy would contemporaneously explain that "this agreement leverages our complementary strengths and will be accretive to our shareholders" and that the "revenue sharing" component would be "a long-term partnership designed to leverage ABG's portfolio."

20.    The Securities Action cites knowledgeable former employees whose accounts contradict defendant Kennedy's above statements. For example, the operative Securities Action complaint alleges that the ABG Agreement was negotiated and executed within "literally a matter of days," a rush job inconsistent with defendant Kennedy's remarks. It further alleges that Tilray overvalued the ABG Agreement at $100 million to arrest the fall in Tilray's stock price that had begun on January 15, 2019. The true value of the ABG Agreement came to light on January 30, 2020, when Tilray renegotiated the ABG Agreement to relieve both parties of their obligatory payments. The renegotiation relieved ABG of its obligatory annual $10 million payment, and in exchange Tilray would not pay the $83.3 million in cash or stock. On January 30, 2020, the same day that the renegotiation was announced, Tilray's stock fell by nearly 9%.

21.    On March 2, 2020, defendant Kennedy and the Board confirmed the extent of the devaluation by disclosing on Tilray's Q4 2019 Quarterly Report on SEC Form 10-Q that Tilray impaired the ABG Agreement by $102.6 million – or over **80%** of its value. At the same time, defendant Kennedy also announced a write down of Tilray's inventory by $68.6 million, over 40%

of its total value. These announcements caused Tilray's stock price to fall by about 18% over the next two days.

22.    These disastrous announcements in January and March of 2020 put a damper on defendant Kennedy's ambitious plans and ultimately his scheme did not come to pass. Aphria dropped negotiations on March 18, 2020, when an anxious world did not know what the next day would bring, let alone the next year. Aphria fared better through COVID-19 than Tilray. When the deal finally closed in December 2020, Aphria was more than twice Tilray's size. And defendant Kennedy even lost the personal control that gave him a negotiating edge. COVID-19 forced Tilray to sell almost 40 million shares and warrants at rock-bottom prices, triggering a provision in its Certificate of Incorporation which automatically converted Class 1 super voting shares into Class 2 ordinary shares when the former accounted for fewer than 10% of the total. With no Class 1 shares, defendant Kennedy and his friends no longer controlled Tilray.

23.    However, defendant Kennedy had more success chasing money than cementing his power over Tilray and later a combined Tilray-Aphria. Defendant Kennedy reaped more than $28 million (net) by selling his personally-held Tilray shares during the Relevant Period. Defendant Kennedy timed his sales very well: he made most of his sales either within two weeks after he began making false statements or within about two months before the corrective disclosures. This also violated a pledge he had made not to sell Tilray shares.

24.    Specifically, on January 24, 2019, defendant Kennedy sold over $11 million worth of his individual stock. This sale occurred less than two weeks after Kennedy publicly promised not to sell any of his Tilray shares.  All told, defendant Kennedy sold over $28 million worth of his stock during the Relevant Period, at a high profit margin. Defendant Kennedy's original purchase price for the shares he sold were mere pennies per share.

25.     In short, defendant Kennedy repeatedly misled stockholders about Tilray and attempted to make himself CEO of the world's largest cannabis company. But for COVID-19, this scheme might have succeeded. The Tilray stockholders that were misled did not fare nearly as well. Nor did Tilray itself, which has been significantly damaged. On February 3, 2023, Tilray's shares traded for about $3.30 per share – significantly below their $143.00 per share high during the Relevant Period. This corresponds to a decline of ***more than 98%***.

26.     Shortly after the truth emerged, the Securities Action was filed in the U.S. District Court for the Southern District of New York. By order dated September 28, 2022, the Hon. Paul A. Crotty ("Judge Crotty") denied Tilray's and defendant Kennedy's motion to dismiss in significant part (the "MTD Order"). Judge Crotty upheld claims that Tilray and Kennedy violated federal securities laws relating to: (i) false statements overvaluing inventory materials which had negligible value, and (ii) false statements touting the value of the ABG Agreement.

27.     Following the recent MTD Order in the Securities Action, on February 8, 2023, Plaintiff issued a pre-suit litigation demand (the "Litigation Demand") to the Board under Delaware law, a true and correct copy of which is attached hereto at Exhibit 1.

28.     In the Litigation Demand, Plaintiff demanded that the Board initiate an independent, reasonable, good faith investigation regarding the allegations therein and take all necessary actions, including filing a lawsuit on the Company's behalf against its wayward "fiduciaries" such as defendant Kennedy, in order to protect the Company's interests and recover the serious damages caused to Tilray by their misconduct. In addition, the Litigation Demand noted that the three-year statute of limitations for breach of fiduciary duty claims under Delaware law would arguably expire on March 2, 2023 (based on the March 2, 2020 disclosures made in Tilray's

Q4 2019 Quarterly Report on SEC Form 10-Q regarding the ABG Agreement and also regarding Tilray's inventory).

29.     To the extent that the Board might not have been prepared to promptly take the actions demanded by Plaintiff in the Litigation Demand prior to the arguable expiration of the applicable statute of limitations on March 2, 2023, Plaintiff demanded that the Board immediately secure tolling agreements from each of the individuals that were implicated or potentially could be implicated in the alleged wrongdoing, including but not limited to the former directors of Tilray named as defendants herein.   The Litigation Demand required the Board to provide written confirmation that such tolling agreements had been secured or would be timely secured no later than February 23, 2023.

30.     The Board failed to respond to Plaintiff at all until February 27, 2023, when the Company's Global General Counsel, Mitchell Gendel ("Mr. Gendel"), sent an email to counsel for Plaintiff, a true and correct copy of which is attached hereto at Exhibit 2.   In his email, Mr. Gendel represented that "Tilray will be contacting the individuals [identified in the Litigation Demand] -- all former directors and officers -- to see if they are willing to enter into tolling agreements.   That process will take more time than you have given us.   I will report back after I have discussed it with them."

31.     Although the Litigation Demand was issued to the Board on February 8, 2023, Mr. Gendel's email provided no indication as to why the individuals identified as wrongdoers in the Litigation Demand had not yet been contacted by the Board, or what steps, if any, the Board had taken to secure tolling agreements following receipt of the Litigation Demand.   Based on the record, it seems that the Board simply sat on its hands until at least February 27, 2023, and that it will not secure the required tolling agreements by March 2, 2023.

32.     Claims for relief belonging to the Company are, of course, valuable corporate assets.  Directors of Delaware corporations such as Tilray are duty-bound to protect and preserve the corporation's assets.

33.     Based on the Board's failure to respond promptly and appropriately to Plaintiff's Litigation Demand, it is now apparent that the Board has either acted recklessly by failing to promptly take the reasonable, basic steps necessary to ensure that Tilray can timely assert its valuable claims, or worse, that the Board has deliberately chose to "run out the clock" and protect the Company's former directors from the consequences of their misconduct.

34.     In either case, by this late point in time, the Board's failure to expeditiously secure tolling agreements despite Plaintiff's explicit demands for tolling agreements under these circumstances -- as the statute of limitations for Tilray's breach of fiduciary duty claims under Delaware law will likely expire shortly -- amounts to functionally ignoring and wrongfully refusing the Demand and failing to protect and preserve the Company's corporate assets, in violation of the Board's fiduciary duties to Tilray and its stockholders.

35.     The Board's clear and wrongful derelictions of duty has left Plaintiff with no choice but to initiate this derivative action at this time to ensure that the Company's valuable claims for relief based on the allegations in the Litigation Demand are properly and timely asserted. Accordingly, this derivative action should proceed.

## II.     JURISDICTION AND VENUE

36.     This Court has jurisdiction under 28 U.S.C. § 1331 because certain of the claims asserted herein arise under §§10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act").

37.     This Court also has supplemental jurisdiction over the state law claims asserted herein under 28 U.S.C. § 1367.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

38.     In connection with the acts, conduct and other wrongs complained of herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

39.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Individual Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.  Nominal defendant Tilray maintains offices in this District and maintained offices in this District at all relevant times.

III.    PARTIES

40.     Plaintiff is a current shareholder of Tilray and has continuously held shares of Tilray common stock since 2018.

41.     Nominal defendant Tilray is a Delaware corporation with its principal executive offices in Ontario, Canada. Since July 2018, Tilray's shares have traded on the NASDAQ exchange under the ticker symbol "TLRY." As of the beginning of the Relevant Period, investment fund Privateer held shares accounting for approximately 82% of the economic interest in, and 93% of the voting power over, Tilray. Tilray was thus a "controlled company" under NASDAQ rules.

42.     Tilray produces and sells marijuana, hemp, and related products. Tilray grows hemp and marijuana in both Canada and Portugal, where it built a large open-air marijuana farm. Tilray has sold medical marijuana or made it available for clinical trials in Argentina, Australia, Canada, Chile, Croatia, Cyprus, the Czech Republic, Germany, Israel, Ireland, New Zealand,

South Africa, Switzerland, the United States, and the United Kingdom. Tilray sells marijuana for recreational use in Canada, and hemp and hemp-derived CBD products in the U.S. and nineteen other countries.

43.     Defendant Kennedy served as Tilray's President and Chief Executive Officer ("CEO") from 2018 to December 15, 2020, and as a member of its Board from January 2018 to November 20, 2022.  Defendant Kennedy also served as Privateer's Executive Chairman from its founding in 2011 through its dissolution in December 2019.  Defendant Kennedy has worked exclusively in the cannabis field since 2011. Until Privateer's dissolution, defendant Kennedy and two of his longtime friends held a majority of Privateer's voting power which, in turn, held a majority voting interest in Tilray. Thus, defendant Kennedy and his friends held indirect voting control over Tilray.

44.     Defendant Maryscott Greenwood ("Greenwood") served as a member of Tilray's Board from June 2018 through September 2020.

45.     Defendant Christine St.Clare ("St.Clare") served as a member of Tilray's Board from June 2018 through May 2021.

46.     Defendant Michael Auerbach ("Auerbach") served as a member of Tilray's Board from February 2018 through May 2021.  Defendant Auerbach also served on the board of directors of Privateer from January 2014 to December 2019.

47.     Defendant Rebekah Dopp ("Dopp") served as a member of Tilray's Board from May 2018 through May 2021.

48.     Defendants Kennedy, Greenwood, St.Clare, Auerbach, and Dopp are collectively referred to as the "Former Directors."

49.     Defendant Irwin D. Simon ("Simon") has serves as Tilray's President and CEO, and as Chairman of the Board, since 2021.

50.     Defendant Renah Persofsky ("Persofsky") has served as a member of Tilray's Board since 2021.

51.     Defendant Jodi Butts ("Butts") has served as a member of Tilray's Board since 2021.

52.     Defendant David Clanachan ("Clanachan") has served as a member of Tilray's Board since 2021.

53.     Defendant John M. Herhalt ("Herhalt") has served as a member of Tilray's Board since 2021.

54.     Defendant David Hopkinson ("Hopkinson") has served as a member of Tilray's Board since 2021.

55.     Defendant Thomas Looney ("Looney") has served as a member of Tilray's Board since 2021.

56.     Defendants Kennedy, Greenwood, St.Clare, Auerbach, Dopp, Simon, Persofsky, Butts, Clanachan, Herhalt, Hopkinson, and Looney are collectively referred to herein as the "Individual Defendants."

57.     Defendants Simon, Persofsky, Butts, Clanachan, Herhalt, Hopkinson, and Looney are sometimes referred to herein as the "Wrongful Refusal Defendants."

IV.     **RELEVANT NON-PARTIES**

58.     According to the operative complaint in the Securities Action, Former Employee 1 ("FE 1") worked as a Senior R&D Manager at Privateer from April 2017 to November 2018. In November 2018, FE 1 and other Privateer employees were transferred to Tilray. FE 1's new title

was Senior Program Manager, but FE 1 's responsibilities did not change. FE 1 worked for Tilray until March 2020. FE 1 reported to Engineering Manager Brent Harrison, who reported to Drew Reynolds, Executive Vice President of Operations Expansion, who reported to defendant Kennedy.

59.     According to the operative complaint in the Securities Action, Former Employee 2 ("FE 2") served as Tilray's Senior Manager of Purchasing in Toronto from October 2019 through May 2020. FE 2 reported to Steve Hatami, a Tilray Vice President, who reported to Greg Christopher, Tilray's Executive Vice President of Operations, who reported to defendant Kennedy. FE 2's responsibilities included procurement for Tilray's four Canadian facilities.

60.     According to the operative complaint in the Securities Action, Former Employee 3 ("FE 3") served as a Tilray Vice President between February 2018 and October 2019. FE 3's duties included overseeing Tilray's business development outside of Canada. FE 3 was "heavily involved with strategic initiatives."

61.     In 2011, the Controlling Shareholders, defendant Kennedy and his two longtime friends Michael Blue and Christian Groh, founded Privateer Holdings, Inc. to invest in the then-illegal cannabis industry. In 2014, the three Controlling Shareholders launched Tilray's predecessor as a Privateer subsidiary, alongside a number of other cannabis-related companies. By the beginning of the Relevant Period (January 2019), Privateer had disposed of substantially all its assets except Tilray shares.

62.     Between 2011 and 2017, Privateer raised hundreds of millions of dollars from outside investors. To secure these investments, the Controlling Shareholders relinquished about two-thirds of their economic interest in Privateer, while retaining majority voting control through supervoting Privateer shares.

## V.      BACKGROUND

63.     Marijuana, hemp, and their derivates all come from the same plant: *cannabis sativa*. Marijuana and hemp are not distinct plants but rather legal categories. By definition, *cannabis sativa* that contains (by weight) less than 0.3% THC is hemp; *cannabis sativa* that contains more than 0.3% is marijuana. This Complaint uses "marijuana" and "hemp" to refer to each legal category separately, and "cannabis" to refer to both collectively.

64.     In December 2018, the U.S. Farm Bill removed hemp from the list of controlled substances, but not marijuana.

65.     The different legal treatment creates a vast gulf between hemp and marijuana. While the federal prohibition against marijuana is rarely enforced, it remains a controlled substance. Because of that federal prohibition, companies that sell products made from marijuana plants in the U.S. ***even in states that have legalized their sale*** face substantial obstacles obtaining bank loans or other services from large banks or, like Tilray, listing on a national securities exchange. For that reason, Tilray cannot violate federal law to sell marijuana products in states where it is legal, even though as a practical matter it would not face prosecution.

66.     THC is concentrated in the marijuana plant's flowers and buds. Because marijuana plants are grown for their THC, producers typically use the marijuana plant's flower and buds to make sellable products for medical or recreational uses.

67.     Cannabis plants also have leaves, stalks, twigs, and stems. These byproducts of the cannabis plant are called "trim" in the industry. Marijuana plant trim is generally considered waste. It contains too little THC to be smoked, is federally prohibited in the U.S., and until December 2019, could not lawfully be used in edibles, foods, beverages, or other products in Canada.

68.     Cannabis plants also contain cannabidiol, commonly known as CBD. Producers can use industrial processes to make CBD oil, which can then be added to foods, topical lotions and oils, and other products. Many consumers believe that CBD has positive medical benefits.

69.     Producers derive CBD from hemp plants. CBD can be extracted from hemp plant's stems and seeds, in addition to its flower. Producers can in theory derive CBD from marijuana plants, but marijuana has less CBD and is federally prohibited in the U.S. Tilray did not use any part of its marijuana plants to make adult use CBD. According to FE 2, Tilray produced its CBD oils from hemp sourced from a Canadian company, B.C. Hemp.

70.     The sole significant regulatory obstacle to the use of hemp-derived CBD is that its addition to an FDA-regulated product may, in the FDA's view, adulterate the product.

## VI.    THE FORMER DIRECTORS OVERSTATE TILRAY'S MARGINS AND THE VALUE OF THE ABG AGREEMENT

### A.    Stockholders Focused on Tilray's Gross Margins

71.     Gross margins, a critical metric for small but growing company like Tilray, measure how much money a company makes on each product it sells. Gross margin is defined as net revenue minus cost of sales divided by net revenue.

72.     Cost of sales is an accounting measure that includes all the costs directly related to manufacturing and selling products but excludes all other costs, such as indirect overhead and sales and marketing costs. The two main components of cost of sales are materials and labor.

73.     Gross margins are relatively sticky or static. Unlike overhead, cost of sales tend to grow proportionally with revenues.[4] Put another way, there are few economies of scale in cost of

---

[4]     Ryan Caldbeck, *5 reasons gross margin is so important to investors & brands*, June 12, 2013, available at https://www.newhope.com/managing-your-business/5-reasons-gross-margin-so-important-investors-brands; Villi Iltchev, *Why Gross Margins Matter*, November 21, 2019, available at https://twosigmaventures.com/blog/article/why-gross-margins-matter/.

sales, but there are many economies of scale in general overhead because it is largely composed of fixed costs.

74.    The Former Directors recognized that stockholders closely monitored Tilray's gross margins. Non-Defendant Tilray CFO Mr. Castaneda consistently ended the prepared remarks portion of earnings calls by calling attention to two key metrics that, he said, made Tilray an attractive investment. One was his claim that Tilray would reach and sustain gross margins of more than 50% over the long term.

75.    The last reported results in Tilray's IPO were those for Q1 2018. In that quarter, Tilray's gross margins were 55%. Tilray's gross margins fell to 46% in Q2 2018, the first quarter it announced after its July 2018 IPO, and to a mere 31% in Q3 2018, the last quarter before the Relevant Period.

76.    Tilray's low gross margins drew analyst concern. In a March 8, 2019 report, a Jefferies analyst initiated coverage of Tilray at a rating of Underperform – the only such rating Jefferies had issued in the past 12 months. The Jefferies analyst gave Tilray the poor rating in part because its cost of sales "appears [to be] one of the least efficient" of similar companies, behind peers Canopy and Aurora.

77.    Understanding that Tilray's poor gross margins disturbed investors, during the Relevant Period, the Former Directors deceived stockholders by both overstating inventory and understating labor costs (both inputs to cost of sales) – thus overstating gross margins.

**B.    The Former Directors Overstated Tilray's Gross Margins**

      *1.    The Former Directors Understated Cost of Sales by Excluding Labor and Materials*

78.    As alleged in the Securities Action, FE 1 had a variety of responsibilities at Tilray. In 2018 through a portion of 2019, FE 1's work focused on high-level planning. FE 1 developed

processes to account for Tilray's cost of sales. FE 1's responsibility was to take particular products and, for each product, determine and price the various materials and labor that went into making the product. The resulting report, called a Bill of Materials, allowed Tilray to determine its cost of sales for particular products and, thereby, its overall cost of sales.

79.     In 2019, as the Bills of Materials were developed for each product, FE 1 's role shifted to developing and supervising Tilray's processes that ensured that Tilray employees would accurately enter costs of materials and labor into Tilray's system.

80.     According to FE 1, Tilray consistently understated the costs of the labor incurred in creating its products. FE 1 reports that Tilray's Technology Manager, Ontario Operations, who oversaw data entry in connection with the Bills of Materials, costs of sales, and inventory accounting, gave his employees improper instructions on entering data. Though FE 1 was "very vocal" about the incorrect directions, neither the Technology Manager nor anyone else at Tilray corrected the directions.

81.     These directions were frequently obviously wrong. For example, FE 1 observed a Toronto-based employee responsible for cost accounting exclude the costs of labor from costs of sales. FE 1 then corrected the employee. Confronted, the employee rationalized that the amount must have been small because it consisted of a few seconds for each labor step. FE 1 responded to the employee that these costs were significant; while any individual employee might spend only a few seconds on each product, because Tilray produced product on an assembly line, the labor of many employees would be required for each finished product. In fact, FE 1 told the employee, Tilray had about a dozen employees working full time on a manufacturing line making that particular product, not to mention all the other employees involved in the process of manufacturing it. FE 1 said that aggregated labor costs were a "true and direct cost" that must be included in the

cost of finished products. But, acting on instructions from the Technology Manager, the employee continued to exclude labor costs.

82.     FE 1's concerns that Tilray was not including costs of labor were particularly acute when it came to pre-rolled marijuana cigarettes, called "pre-rolls". According to FE 1, beginning in the last quarter of 2018, Tilray started accumulating millions of pre-rolls. Pre-rolls are "super labor-intensive" and "sell cheap". Because they cost a lot in labor but sell at a low price, excluding labor costs substantially overstates the pre-rolls' profitability. FE 1 is certain that the pre-roll's cost of sales was artificially lowered because FE 1 used Tilray's software to look up cost of sales for the pre-rolls. FE 1 then saw that the labor costs Tilray reported were substantially lower than those FE 1 had established.

83.     Yet the flawed Bills of Materials FE 1 helped create were the foundation of Tilray's financial reporting. According to FE 1, to prepare financial statements, financial information was first exported from the specialized software in which FE 1 stored it into an Excel spreadsheet. The Excel spreadsheet was then used as the starting point to generate financial statements. Thus, the errors in the Bills of Materials would carry over into the financial statements.

84.     According to FE 1, the costs that had not been correctly entered as costs of sales were instead improperly recorded as general and administrative expenses (indirect overhead) to make the financial statements balance. Classified as overhead, the costs would not be worrying. Investors would assume the costs would not grow proportionally with revenues.

85.     FE 1 raised internal alarms about Tilray's inaccurate financial statements. FE 1 told FE 1's boss Steve Hatami that because the Bills of Materials did not include all costs, using them to generate financial statements would understate cost of sales – or, as FE 1 told Hatami, "garbage in, garbage out." Hatami then repeatedly swore at FE 1.

86.     The account in the Securities Action of FE 2 corroborates FE 1's account. According to the Securities Action, FE 2 cites an example of obsolete product recorded as valuable inventory. According to FE 2, Tilray purchased a variety of custom formulated oils, which were oils containing precise specifications of THC and CBD oil mixes and potencies. The formulated oils were not generic ingredients and could not be reused in other products. In 2019, Tilray accumulated "single digit millions of Canadian dollars" (about $750,000-$7,500,000) of formulated oils to use in its wellness brand products. Tilray then "killed the brand" and, indeed, abandoned formulated oils altogether. Yet the formulated oils continued to be classified as inventory on Tilray's financial statements at the cost of acquisition. Because the formulated oils had no resale value and no use, they should not have been recorded as inventory at all.

2.     *The Former Directors Understated Cost of Sales by Recording Worthless Waste as Valuable Byproduct*

87.     Manufacturing creates intermediate and sellable products. Often, these products are not sold or finished before the close of the reporting period. The unsold and unfinished products are recorded on financial statements as inventory at the lesser of the costs of production or the net realizable value.

88.     The formula for cost of sales reflects that some of the valuable immediately sellable product created in a particular period may still be in inventory when the period closes. Thus, the formula for costs of sales is: (1) inventory at beginning of reporting period (2) *minus* inventory at end of reporting period (3) *plus* direct labor, direct materials, and direct overhead (e.g. commissions) attributed to sold products.

89.     During its 2019 fiscal year, Tilray accumulated more than $100 million in inventory on its financial statements. According to the accounts of both FE 1 and FE 2 in the Securities Action, much of Tilray's inventory consisted of unsellable waste.

90.     In December 2019, FE 1 made two trips to Tilray's Ontario, Canada facilities. While there, FE 1 was asked questions by employees of Tilray's finance department. FE 1 was told by these employees that Tilray had accumulated in inventory very large quantities of unusable materials.

91.     FE 1 learned that many of the products had never been worth anything in the first place. Tilray's production of marijuana generated substantial "end of run" materials, meaning leftover raw materials that cannot be used in the manufacture of additional products – *i.e.*, trim.

92.     FE 1 personally saw the materials. In a visit to Tilray's warehouses, FE 1 observed kilograms and kilograms of trim "sitting on a shelf." There were "bags and bags, boxes and boxes" of end-of-run materials. Moreover, unlike with its other products, Tilray did not provide any information internally about the value of these products. Instead, Tilray internally recorded the inventory at an "unknown, unspecified value." The items usually had no value assigned to them in Tilray's internal systems.

93.     With no way to sell these end of run materials from marijuana plants, they should have been classified as waste. Thus, for example, if it costs Tilray $10 in materials and labor to create one gram of sellable marijuana, but the process also creates unsellable trim, the marijuana should be recorded in Tilray's inventory as the lesser of $10 or the amount of money the Company can make by selling it. Then, if the gram were later sold for $10, the inventory should be debited by $10.

94.     But while the trim was not valued for internal purposes, Tilray recorded a value for the trim on its financial statements. In fact, Tilray ultimately recorded ***more than $40 million of marijuana plant trim*** in its Q3 2019 financial statements.

95.     By misclassifying trim, Tilray's financial performance was embellished. As a matter of accounting, every dollar of inventory on Tilray's financial statements is subtracted from its cost of sales. The following table shows how improperly attributing value to the end-of-run waste materials will inflate gross margins and inventory values, if Tilray produced two grams of marijuana and was able to sell one while recording the value of the end-of-run materials as $5.

| Realizable price of marijuana | Action | Revenue | Inventory | Cost of Goods Sold | Gross Margin |
|---|---|---|---|---|---|
| $20 | Treating trim as waste per GAAP | $20 | $10 | $20 | $33^{1/3}\%$ |
|  | Falsely treating trim as inventory | $20 | $15 | $15 | 57.1% |
| $10 | Treating trim as waste per GAAP | $10 | $10 | $20 | 0% |
|  | Falsely treating trim as inventory | $10 | $15 | $15 | 40% |

96.     Tilray could never hope to sell its marijuana trim in the U.S. during any reasonable time frame. Under U.S. law, marijuana plants and any CBD derived from them are controlled substances. The marijuana trim that Tilray had accumulated could only lawfully be sold in the U.S. if and when the federal government legalized marijuana – which, during the Relevant Period, was not on the horizon. While that prohibition was almost never enforced in states in which marijuana was legal, Tilray's banking relationships and NASDAQ listing depended on compliance with federal law.

97.     During the Relevant Period, there was no market for marijuana trim in Canada, either. Canada planned to legalize marijuana in two steps. In the first step, which occurred before the Relevant Period, Canada legalized the sale of marijuana buds and flowers, which are used to make marijuana cigarettes. Marijuana plant trim could not be used in edibles or beverages, topicals, or extracts, whether ingested or inhaled. In the second step, colloquially known as Cannabis 2.0, Canada would legalize the sale of these products.

24

98.     As the Former Directors explained in the Company's 2019 10-K:

[C]urrently, limited classes of cannabis, including dried cannabis and [CBD] oils, are permitted for sale into the medical and adult-use markets. New classes, including edibles, topicals, and extracts (both ingested and inhaled), are expected to be permitted on or before October 17, 2019[.]

99.     At the beginning of the Relevant Period, Canada had not scheduled the legalization of Cannabis 2.0 products. In July 2019, Canada scheduled that legalization for December 2019. Before then, there was no market for marijuana plant trim.

100.    GAAP prohibits companies from recording inventory that has no immediate use. Products that may develop a use in the future should be recorded as a contingent asset. "A contingency that might result in a gain usually should not be reflected in the financial statements because to do so might be to recognize revenue before its realization." ASC 450-30-25-1. To record assets that might have a value in the future misleadingly conceals that for a variety of reasons, a market might never even develop. Thus, none of the financial statements which the Former Directors caused Tilray to file during the Relevant Period could recognize trim as inventory.

**C.     The Former Directors Misleadingly Characterize an Investor Relations Stunt as a Major Accomplishment**

*1.      Tilray Agrees to Pay ABG $100 Million to Prop Up Its Share Price*

101.    On January 14, 2019, Tilray reached a co-branding agreement with Authentic Brands Group, LLC ("ABG" and "ABG Agreement"). ABG owns and co-markets 50 leadings brands throughout the world, including Juicy Couture, Brooks Brothers, Shaquille O'Neal, and Elvis Presley. When Tilray signed the ABG Agreement, ABG's brands did not offer cannabis or CBD-related products. According to Tilray, the ABG Agreement's purpose was to expand ABG's brands into cannabis- and CBD-related products throughout the world.

102.    The ABG Agreement's principal terms were:

    a.    Tilray initially pays ABG $100 million in cash and stock, and up to $150 million in future consideration ("Additional Tilray Consideration");

    b.    Tilray is ABG's preferred supplier of cannabis and CBD-related ingredients;

    c.    Tilray receives up to 49% of net revenue from cannabis products bearing ABG's brands' names, with a guaranteed annual minimum payment of $10 million ("Revenue Interest");

    d.    Unless and until Tilray pays the full Additional Tilray Consideration, Tilray's Revenue Interest will be reduced by the percentage of unpaid total consideration. Thus, for example, if Tilray did not pay any Additional Tilray Consideration, then Tilray would only receive 40% of the Revenue Interest, or about 12% of the net revenue. The guaranteed minimum annual payment would be $4 million.

103.    In Q1 2019, Tilray invested $33 million in Additional Consideration.

104.    In the Securities Action, FE 3 reports that the ABG Agreement was proposed, negotiated, and closed in literally a matter of days. Further, according to FE 3, only two Tilray representatives, one of whom was defendant Kennedy, negotiated the ABG Agreement. These representatives barely consulted with anyone else at Tilray. FE 3 called Tilray's due diligence into the ABG Agreement "very irresponsible." According to FE 3, the main reason defendant Kennedy had entered into the ABG Agreement was to "prop up Tilray's stock [price]"by "mak[ing] a big splash."

105.    Mere days are not enough to consider and negotiate, and conduct due diligence on, a complex licensing agreement requiring Tilray to pay a minimum of $100 million.

106.    The timing of the ABG Agreement supports FE 3's account of its purpose. In connection with Tilray's IPO, pre-IPO investors signed lock-up agreements preventing them from selling their shares for 6 months. The lock-up expired before trading on January 15, 2019. The newly-released shares nearly doubled Tilray's existing public float.[5] On January 15, Tilray's stock price fell by 17% on volume three times higher than the previous day's. That very day, after trading, Tilray announced the ABG Agreement. The announcement of the ABG Agreement arrested the fall.

107.    According to FE 3, it was "immediately very clear" that the ABG Agreement was not worth what Tilray had paid for it. Tilray's own branding employees "push[ed] back" on the deal, asking "what are we going to do?" with ABG brands. Indeed, according to the account of FE 3, it was apparent the ABG Agreement was "never going to bear fruit" the "second the deal was signed." According to FE 3, the eventual write-off had nothing to do with the U.S. regulatory market.

2.    *The ABG Agreement Appears to Be the Realization of Tilray's Goals*

108.    For years, defendant Kennedy has been telling the public that the future of cannabis companies, and of Tilray in particular, is branded products. Defendant Kennedy told *volteface*, an industry publication, as early as March 2016:

> Brands are everything.[] Brands are how you win. Any consumer will choose a branded product over something in a plastic baggy. Brands inspire confidence and trust. Brands imply legitimacy. They reduce barriers to change. They give comfort to consumers. People are looking for a product which is safe, properly labelled, and consistent from experience to experience.

---

[5]    Not counting Tilray shares held by Privateer, as it had publicly stated it would not sell its shares.

109.    Defendant Kennedy continued to express the view that the future of the cannabis industry is branded products. For example, Kennedy told *Market Watch* in an interview published on July 22, 2018 that:

> It is still day one in the industry, that's how we think about it. And the challenge that we faced with some investors is how this industry is going to change. I like to say Ziploc is the biggest brand in the cannabis industry and over the next few years you're going to see that change, you're going to see real brands and real companies.

110.    Indeed, to hear defendant Kennedy tell it, there is little money to be made by growing cannabis. To take just one example, in a September 18, 2018 appearance on CNBC's *Mad Money* program, defendant Kennedy told the host:

> Q: You know that all the addition in cannabis when we saw it happen in Oregon, prices went through the floor. It's the cheapest in America. You're not concerned that with all of the different supply coming on, that you could have a considerable collapse even in Canadian prices?
>
> **Defendant Kennedy:** No, it's like valuing ABI [a beer company] on the price of wheat. ***Cannabis is a raw material. It is an ingredient that we use in these branded products. You're not going to see the commoditization of the finished product in the brands.*** You'll see price segmentation, value brands, premium brands, but you won't see commoditization of the brands across the spectrum.

111.    Thus, the ABG Agreement was critical to stockholders because it seemed to show that Tilray was creating successful branded products.

## VII.    THE FORMER DIRECTORS' FALSE STATEMENTS

112.    The Relevant Period begins on January 16, 2019. The previous day, after close of trading, Tilray announced that it had entered into the ABG Agreement.

113.    In a press release announcing the ABG Agreement, the Former Directors stated:

> NANAIMO, B.C. – Today, Tilray, Inc. (NASDAQ: TLRY), a global pioneer in cannabis production and distribution, and Authentic Brands Group (ABG), an owner of a portfolio of global lifestyle and entertainment brands, announced that they have signed a long-term revenue sharing agreement to market and distribute a portfolio of consumer cannabis products within ABG's brand portfolio in jurisdictions where regulations permit.

28

\*     \*     \*     \*     \*

"We are thrilled to partner with ABG, a global leader known for expertly managing and marketing an owned portfolio of iconic brands," said Brendan Kennedy, Tilray President and CEO. "As we work to expand Tilray's global presence, ***this agreement leverages our complementary strengths and will be accretive to our shareholders*** as we reach new consumers across the entertainment, fashion, beauty, home and health and wellness sectors. We look forward to working with ABG to bring unique and sought-after branded cannabis products to the marketplace."

114.    Defendant Kennedy's statements were misleading because: (a) reasonable stockholders would assume that Tilray had conducted significant negotiations and due diligence before signing a $100 million agreement, yet the ABG Agreement was proposed, negotiated, and closed in a matter of days, all to prop up Tilray's stock price; (b) the Former Directors understood that the ABG Agreement would not be accretive but would instead have to be impaired (*i.e.* written down on Tilray's financial statements); (c) the ABG Agreement did not leverage Tilray and ABG's strengths, but instead was a one-sided giveaway to ABG; and, therefore, (d) defendant Kennedy's statements gave stockholders the misleading impression that the ABG Agreement was carefully negotiated and that Tilray had conducted adequate due diligence.

115.    A January 16, 2019 article in the *Financial Post* quoted defendant Kennedy as saying:

"The reason we signed this agreement is because we're getting a global license to use these very iconic brand names. That fits into our strategy of valuing brands — we believe brands matter and are the future of this industry," Tilray CEO Brendan Kennedy told the Financial Post.

***"They liked our focus on research and science, and when the U.S. Farm Bill passed [on December 20, 2018], things started coming together,"*** Kennedy said.[6]

116.    Defendant Kennedy's statements were false or misleading because: (a) there were no discussions of the ABG Agreement before the U.S. Farm Bill; (b) the ABG Agreement was not

---

[6]    Defendant Kennedy tweeted a link to the article from his personal Twitter account.

proposed until mere days before January 14, 2019; (c) it is not possible to adequately consider, negotiate, and conduct due diligence on, a $100 million agreement in mere days; and, therefore, (d) defendant Kennedy's statements gave stockholders the misleading impression that the ABG Agreement was carefully negotiated and that Tilray had conducted adequate due diligence.

117.    On March 18, 2019, Tilray held a call to discuss its Q4 2018 earnings. On that call, defendant Kennedy stated that ***"[o]ur revenue sharing agreement with Authentic Brands Group (ABG) is a long-term partnership designed to leverage ABG's portfolio of more than 50 of the world's most iconic brands, as well as their extensive distribution network across North America."***

118.    Defendant Kennedy's statements were misleading because: (a) reasonable stockholders would assume that Tilray had conducted significant negotiations and due diligence before signing a $100 million agreement, yet the ABG Agreement was proposed, negotiated, and closed in a matter of days to prop up Tilray's stock price; (b) the ABG Agreement did not leverage ABG's portfolio, but instead was a one-sided giveaway to ABG; and, therefore, (c) defendant Kennedy's statements gave stockholders the misleading impression that the ABG Agreement was carefully negotiated and that Tilray had conducted adequate due diligence.

119.    On March 25, 2019, the Former Directors caused Tilray to file its Annual RTeport on SEC Form 10-K for the year ended December 31, 2018 ("2018 10-K"). Defendants Kennedy, Auerbach, Dopp, Greenwood, and St.Clare each signed the 2018 10-K.

120.    The 2018 10-K falsely stated:

*Inventory*
Inventory is comprised of raw materials, finished goods and work-in-progress such as pre-harvested cannabis plants and by-products to be extracted. The costs of growing cannabis including but not limited to labor, utilities, nutrition and irrigation, are capitalized into inventory until the time of harvest.

Inventory is stated at the lower of cost or net realizable value, determined using weighted average cost. Cost includes expenditures directly related to manufacturing and distribution of the products. Primary costs include raw materials, packaging, direct labor, overhead, shipping and the depreciation of manufacturing equipment and production facilities determined at normal capacity. Manufacturing overhead and related expenses include salaries, wages, employee benefits, utilities, maintenance and property taxes.

***Net realizable value is defined as the estimated selling price in the ordinary course of business, less reasonably predictable costs of completion, disposal and transportation.*** At the end of each reporting period, the Company performs an assessment of inventory obsolescence to measure inventory at the lower of cost or net realizable value. Factors considered in the determination of obsolescence include slow-moving or non-marketable items.

121.     The financial statements published in the 2018 10-K also reported the following financial metrics for the year ended December 31, 2018:

| Revenue | $43.1 million |
|---|---|
| Cost of Sales | $28.9 million |
| Gross margin ($) | $14.3 million |
| Gross margin (% of revenue) | 33% |
| Inventory | $16.2 million |
| General & administrative expenses ($) | $31.3 million |
| General & administrative expenses (% of revenue) | 73% |

122.     The Former Directors' statements were false because: (a) Tilray recognized marijuana plant trim as inventory; (b) there was no legal market for marijuana plant trim; (c) under GAAP, Tilray could not recognize marijuana plant trim as inventory because there was no immediate use for it; (d) marijuana plant trim might never become sellable if, for example, Canada did not legalize marijuana plant-based trim in Cannabis 2.0, or a market for Cannabis 2.0 products did not develop, or customers showed no interest for trim-based Cannabis 2.0 products (as opposed to flower- or bud-based products), or if the market that developed was so flooded with trim that Tilray's trim was nearly worthless; (e) Tilray was not recognizing the value of marijuana plant-

based trim "as the estimated selling price in the ordinary course of business" because marijuana plant-based trim could not be sold in the ordinary course of business; and (f) as a result of (a)-(e), the Former Directors overstated both Tilray's inventory and gross margins.

123.    On May 14, 2019, Tilray held a call to discuss its Q1 2019 earnings ("Q1 2019 Earnings Call").

124.    On the call, defendant Kennedy volunteered that the ability to convince ABG to do business with Tilray was evidence that consumer packaged goods companies saw Tilray as an attractive partner:

> Q: [] Just thinking about it from a perspective of a CPG [consumer packaged goods] company, evaluating the cannabis opportunity. What do you feel are the advantages or merits for a CPG company to partner with a Canadian-licensed producer versus considering a strategy such as leveraging offtake from a more dedicated extraction company and then just using their own CPG brands for whether it's with the U.S. CPG market or other markets out there.
>
> **Defendant Kennedy:** *[W]e know how to partner well not only with pharmaceutical and alcohol companies but with companies like Authentic Brands Group that own over 50 iconic brands. They went through a similar vetting process and decided that it's much better for them in the long run to partner with Tilray than do it alone.*

125.    Defendant Kennedy's statements were misleading because: (a) reasonable stockholders would assume that Tilray had conducted significant negotiations and due diligence before signing a $100 million agreement, yet the ABG Agreement was proposed, negotiated, and closed in a matter of days to prop up Tilray's stock price; (b) ABG did not vet Tilray, but instead, the ABG Agreement was proposed, negotiated, and closed within a matter of days, and therefore there was no time to vet Tilray; (c) ABG did not vet Tilray because Tilray's offer was so generous that it would have been crazy for ABG not to agree; and therefore, (d) defendant Kennedy's statements gave stockholders the misleading impression that the ABG Agreement was carefully negotiated and that Tilray had conducted adequate due diligence.

126.    On May 15, 2019, Defendants caused Tilray to file its 10-Q for Q1 2019 (the "Q1 2019 10-Q"). Defendant Kennedy signed the Q1 2019 10-Q.

127.    The Q1 2019 10-Q falsely stated:

*Inventory*

Inventory is comprised of raw materials, finished goods and work-in-progress such as pre-harvested cannabis plants and by-products to be extracted. The costs of growing cannabis including but not limited to labor, utilities, nutrition and irrigation, are capitalized into inventory until the time of harvest.

Inventory is stated at the lower of cost or net realizable value, determined using weighted average cost. Cost includes expenditures directly related to manufacturing and distribution of the products. Primary costs include raw materials, packaging, direct labor, overhead, shipping and the depreciation of manufacturing equipment and production facilities determined at normal capacity. Manufacturing overhead and related expenses include salaries, wages, employee benefits, utilities, maintenance and property taxes.

***Net realizable value is defined as the estimated selling price in the ordinary course of business, less reasonably predictable costs of completion, disposal and transportation.*** At the end of each reporting period, the Company performs an assessment of inventory obsolescence to measure inventory at the lower of cost or net realizable value. Factors considered in the determination of obsolescence include slow-moving or non-marketable items.

128.    The Q1 2019 10-Q further stated that:

***Inventory is written down for any obsolescence or when the net realizable value of inventory is less than the carrying value.*** For the three months ended March 31, 2019, the Company recorded write-downs within work-in-process of $1,626[,000] in cost of sales. There were no write-downs in cost of sales for the comparable period in 2018.

129.    The financial statements set out in the Q1 2019 10-Q also reported the following financial metrics for the quarter ended March 31, 2019:

| Revenue | $23.0 million |
|---|---|
| Cost of Sales ($) | $17.7 million |
| Gross margin ($) | $5.4 million |
| Gross margin (% of revenue) | 23% |
| Inventory | $48.7 million |
| General & administrative expenses ($) | $12.8 million |
| General & administrative expenses (% of revenue) | 56% |

130.     The Former Directors' statements were false because: (a) Tilray recognized marijuana plant trim as inventory; (b) there was no legal market for marijuana plant trim; (c) under GAAP, Tilray could not recognize marijuana plant trim as inventory because there was no immediate use for it; (d) marijuana plant trim might never become sellable if, for example, Canada did not legalize marijuana plant-based trim in Cannabis 2.0, or a market for Cannabis 2.0 products did not develop, or customers showed no interest for trim-based Cannabis 2.0 products (as opposed to flower- or bud-based products), or if the market that developed was so flooded with trim that Tilray's trim was nearly worthless; (e) Tilray was not recognizing the value of marijuana plant-based trim "as the estimated selling price in the ordinary course of business" because marijuana plant-based trim could not be sold in the ordinary course of business; and (f) as a result of (a)-(e) the Former Directors overstated both Tilray's inventory and gross margins.

131.     In its Q1-Q3 2019 10-Qs, Tilray recorded the value of the ABG Agreement as the consideration Tilray paid for it. Tilray recorded the majority of the value of the agreement as an intangible asset with an indefinite life.[7]

132.     The Q1 2019 10-Q provided that:

As of March 31, 2019, the Company recorded an intangible asset with indefinite life in the amount of $151,096[,000] for the participation rights, preferred supplier rights, and preferred royalty rights under the [ABG Agreement], as described above. The cost of this intangible asset was calculated as the fair value of the cash paid and shares issued, less the fair value attributable to the loan described above. As of March 31, 2019, the Company recorded a deferred tax liability of $31,730[,000] relating to this intangible asset.

---

[7]     The value of the guaranteed payments was recorded as a combination of assets and equity.

133.   GAAP provision ASC 350-30 governs accounting and financial reporting of intangible assets.

134.   GAAP provision ASC 360-35-18 directs that "[a]n intangible asset that is not subject to amortization shall be tested for impairment annually and more frequently if events or changes in circumstances indicate that it is more likely than not that the asset is impaired."

135.   To test for impairment, GAAP provision ASC 360-35-18B directs that companies shall "assess all relevant events and circumstances that could affect the significant inputs used to determine the fair value of the indefinite-lived intangible asset." After the examination, if the company determines that it is more likely than not that impairment was warranted, the company should proceed to a quantitative evaluation of the amount of impairment.

136.   GAAP then directs a quantitative test, which is set out in ASC 360-35-19:[8]

The quantitative impairment test for an indefinite-lived intangible asset shall consist of a comparison of the fair value of the asset with its carrying amount. If the carrying amount of an intangible asset exceeds its fair value, an entity shall recognize an impairment loss in an amount equal to that excess. After an impairment loss is recognized, the adjusted carrying amount of the intangible asset shall be its new accounting basis.

137.   Thus, the Former Directors' statements were false and misleading because: (a) as set out above, the Former Directors were aware of facts showing and understood that the ABG

---

[8]   Similarly, Tilray's impairment policy, set out in each of the Q1-Q3 2018 10-Qs, provided that:

Goodwill and indefinite life intangible assets are tested for impairment annually, or more frequently when events or circumstances indicate that impairment may have occurred. As part of the impairment evaluation, the Company may elect to perform an assessment of qualitative factors. If this qualitative assessment indicates that it is more likely than not that the fair value of the indefinite-lived intangible asset or the reporting unit (for goodwill) is less than its carrying value, a quantitative impairment test to compare the fair value to the carrying value and record an impairment charge if the carrying value exceeds the fair value is conducted.

Agreement was worth less than what Tilray paid for it; (b) as a result, ASC 360-35-18 required Tilray to test for impairment, ASC 360-35-18B required Tilray to run a quantitative test for impairment, and ASC 360-35-19 required Tilray to impair the ABG Agreement by $102.6 million; (c) the failure to impair the ABG Agreement gave stockholders the misleading impression that the ABG Agreement was carefully negotiated and that Tilray had conducted adequate due diligence.

138.    On August 13, 2019, Tilray held a call to discuss its Q2 2019 earnings ("Q2 2019 Earnings Call").

139.    There, the Former Directors continued to reassure stockholders that the ABG Agreement was bearing returns. In prepared remarks, defendant Kennedy stated:

> Our strategic partnership with Authentic Brands Group, which we announced in Q1, continues to build momentum with our first product launch planned for the second half of the year in the United States. ***The ABG partnership is a first of its kind deal leveraging ABG's portfolio of more than 50 of the world's most iconic brands for the global CBD market.***

140.    Defendant Kennedy's statements were misleading because: (a) reasonable stockholders would assume that Tilray had conducted significant negotiations and due diligence before signing a $100 million agreement, yet the ABG Agreement was proposed, negotiated, and closed in a matter of days to prop up Tilray's stock price; (b) the Former Directors understood that the ABG Agreement would not be accretive but would instead have to be impaired (*i.e.* written down on Tilray's financial statements); (c) the ABG Agreement did not leverage ABG's portfolio, but instead was a one-sided giveaway to ABG; and, therefore, (d) defendant Kennedy's statements gave stockholders the misleading impression that the ABG Agreement was carefully negotiated and that Tilray had conducted adequate due diligence.

141.    Regarding inventory, defendant Kennedy stated:

> ***We're building inventory as we await [] GMP [Good Manufacturing Practices] licenses [for the Portugal operations]*** and we'll continue to harvest on a weekly

and monthly basis and build inventory until we have those additional GMP certifications.

142.    Defendant Kennedy's statements were misleading because: (a) Tilray recognized marijuana plant trim as inventory; (b) there was no legal market for marijuana plant trim; (c) under GAAP, Tilray could not recognize marijuana plant trim as inventory because there was no immediate use for it; (d) marijuana plant trim might never become sellable if, for example, Canada did not legalize marijuana plant-based trim in Cannabis 2.0, or a market for Cannabis 2.0 products did not develop, or customers showed no interest for trim-based Cannabis 2.0 products (as opposed to flower- or bud-based products), or if the market that developed was so flooded with trim that Tilray's trim was nearly worthless; (e) Tilray was not recognizing the value of marijuana plant-based trim "as the estimated selling price in the ordinary course of business" because marijuana plant-based trim could not be sold in the ordinary course of business; and (f) as a result of (a)-(e) whatever small amounts of inventory Tilray accumulated in Portugal paled next to Tilray's huge inventory buildup from improperly recognizing marijuana plant trim as inventory.

143.    On August 13, Tilray filed its 10-Q for the quarter ended June 30, 2019 ("Q2 2019 10-Q"). Defendant Kennedy signed the Q2 2019 10-Q.

144.    The Q2 2019 10-Q provided:

*Inventory*

Inventory is comprised of raw materials, finished goods and work-in-progress such as pre-harvested cannabis plants and by-products to be extracted. The costs of growing cannabis including but not limited to labor, utilities, nutrition and irrigation, are capitalized into inventory until the time of harvest.

Inventory is stated at the lower of cost or net realizable value, determined using weighted average cost. Cost includes expenditures directly related to manufacturing and distribution of the products. Primary costs include raw materials, packaging, direct labor, overhead, shipping and the depreciation of manufacturing equipment and production facilities determined at normal capacity. Manufacturing overhead

and related expenses include salaries, wages, employee benefits, utilities, maintenance and property taxes.

***Net realizable value is defined as the estimated selling price in the ordinary course of business, less reasonably predictable costs of completion, disposal and transportation.*** At the end of each reporting period, the Company performs an assessment of inventory obsolescence to measure inventory at the lower of cost or net realizable value. Factors considered in the determination of obsolescence include slow-moving or non-marketable items.

145.    The financial statements set out in the Q2 2019 10-Q reported the following financial metrics for the quarter ended June 30, 2019:

| | |
|---|---|
| Revenue | $45.9 million |
| Cost of Sales ($) | $33.6 million |
| Gross margin ($) | $12.3 million |
| Gross margin (% of revenue) | 27% |
| Inventory | $75.3 million |
| General & administrative expenses ($) | $16.5 million |
| General & administrative expenses (% of revenue) | 36% |

146.    The Former Directors' statements were false because: (a) Tilray recognized marijuana plant trim as inventory; (b) there was no legal market for marijuana plant trim; (c) under GAAP, Tilray could not recognize marijuana plant trim as inventory because there was no immediate use for it; (d) marijuana plant trim might never become sellable if, for example, Canada did not legalize marijuana plant-based trim in Cannabis 2.0, or a market for Cannabis 2.0 products did not develop, or customers showed no interest for trim-based Cannabis 2.0 products (as opposed to flower- or bud-based products), or if the market that developed was so flooded with trim that Tilray's trim was nearly worthless; (e) Tilray was not recognizing the value of marijuana plant-based trim "as the estimated selling price in the ordinary course of business" because marijuana plant-based trim could not be sold in the ordinary course of business; and (f) as a result of (a)-(e), the Former Directors overstated both Tilray's inventory and gross margins.

147.    The Q2 2019 10-Q also provided that:

As of June 30, 2019, the Company recorded intangible assets with indefinite life in the amount of $119,366[,000] for the participation rights, preferred supplier rights, and preferred royalty rights under the [ABG Agreement], as described above. The cost of these intangible assets was calculated using the fair value of the cash paid and shares issued, less the fair value attributable to the loan described above. During the three months ended June 30, 2019, the Company reversed the deferred tax liability of $31,730[,000] that should not be recorded as part of these intangible assets.

148.    The Former Directors' statements were false because: (a) as set out above, the Former Directors were aware of facts showing and understood that the ABG Agreement was worth less than Tilray paid for it; (b) as a result, ASC 360-35-18 required Tilray to test for impairment, ASC 360-35-18B required Tilray to run a quantitative test for impairment, and ASC 360-35-19 required Tilray to impair the ABG Agreement by $102.6 million; and (c) the failure to impair the ABG Agreement gave stockholders the misleading impression that the ABG Agreement was carefully negotiated and that Tilray had conducted adequate due diligence.

149.    In addition, ASC 360-35-18B provides a non-exhaustive list of factors to consider in determining whether to impair assets, which includes:

c. Legal, regulatory, contractual, political, business, or other factors, including asset-specific factors that could affect significant inputs used to determine the fair value of the indefinite-lived intangible asset

*       *       *       *       *

e. Industry and market considerations such as a deterioration in the environment in which an entity operates, an increased competitive environment, a decline in market-dependent multiples or metrics (in both absolute terms and relative to peers), or a change in the market for an entity's products or services due to the effects of obsolescence, demand, competition, or other economic factors (such as the stability of the industry, known technological advances, legislative action that results in an uncertain or changing business environment, and expected changes in distribution channels) that could affect significant inputs used to determine the fair value of the indefinite-lived intangible asset

150.    In Q4 2019, Tilray would impair the ABG Agreement by $102.6 million, citing the impact of regulatory uncertainty on potential CBD sales.

151.    Both the regulatory uncertainty and the impact existed when Tilray issued its Q2 2019 financial statements. On the Q2 2019 call, defendant Kennedy explained that a majority of stores were not purchasing CBD in light of FDA regulatory uncertainty:

> Q: Okay. Great. And I was just also hoping for potentially more color in terms of how you guys see the ramp on the CBD side in the US in the back half of the year.
>
> **Defendant Kennedy**: So the ramp will be somewhat dependent upon how much clarity the FDA does give. ***We do see a lot of the major retailers holding off, especially on the ingestible products, until they have more clarity.*** As that clarity comes in the second half, we see significant ramp in the second half of the year. If it does not, we see a much slower ramp on the CBD side for again, on ingestible side.

152.    Even if Tilray did not need to impair the ABG Agreement on its Q1 2019 10-Q, it would still have to impair it on the Q2 and Q3 2019 10-Qs. Though there would be no change in the FDA's position between August 2019 and March 2020, Tilray would impair the ABG Agreement in Q4 2019 because of regulatory uncertainty from the FDA. Because the conditions constituting the "regulatory uncertainty" that served as Tilray's excuse to impair the ABG Agreement already existed in August 2019, Tilray was required to impair the agreement in the Q2 2019 10-Q. For this additional reason, Tilray's failure to impair the ABG Agreement misled stockholders.

153.    On November 12, 2019, the Former Directors caused Tilray to file its Q3 2019 for the three months ended September 30, 2019 ("Q3 2019 10-Q") and held a call to discuss its Q3 2019 earnings ("Q3 2019 Earnings Call").

154.    The Q3 2019 10-Q provided that:

> As of June 30, 2019, the Company recorded intangible assets with indefinite life in the amount of $119,366[,000] for the participation rights, preferred supplier rights, and preferred royalty rights under the [ABG Agreement], as described above. The cost of these intangible assets was calculated using the fair value of the cash paid and shares issued, less the fair value attributable to the loan described above. During the three months ended June 30, 2019, the Company reversed the deferred tax

liability of $31,730[,000] that should not be recorded as part of these intangible assets.

155.    The Former Directors' statements were false because: (a) as set out above, the Former Directors were aware of facts showing and understood that the ABG Agreement was worth less than Tilray paid for it; (b) as a result, ASC 360-35-18 required Tilray to test for impairment, ASC 360¬35-18B required Tilray to run a quantitative test for impairment, and ASC 360-35-19 required Tilray to impair the ABG Agreement by $102.6 million; (c) the failure to impair the ABG Agreement gave stockholders the misleading impression that the ABG Agreement was carefully negotiated and that Tilray had conducted adequate due diligence.

156.    The statement was also false for the reasons set out in ¶152 above, namely that the regulatory uncertainty and its consequences that caused Tilray to impair the ABG Agreement in Q4 2019 already existed in Q3 2019.

157.    Moreover, in Q3 2019, the Former Directors made it very clear that they were well aware of the regulatory uncertainty and its consequences and were adjusting Tilray's financial metrics to take it into account.

158.    In the question-and-answer portion of the Q3 2019 Earnings Call, Mr. Castaneda stated that "[l]ooking at the revenue ramp for really more 2020 there's very little US CBD in those numbers. So [any U.S. CBD revenues] would primarily be upside." At the close of the earnings call, Mr. Castaneda added "[t]he CBD internally our models are pretty conservative just because we are waiting for the FDA."

159.    Asked about the US CBD market, Mr. Castaneda stated:

Yes. So, on just the – we kind of bifurcate the food versus the CBD. And the CBD internally our models are pretty conservative just because we are waiting for the FDA. And we do believe that with FDA clearance that will be a step change. We just can't – we don't know what that timing is.

***So we're modeling pretty conservatively for 2020 for US CBD. Until we have that regulatory change, we are not going to adjust our numbers up.***

160.    But the Former Directors gave the misleading impression that they were working around the regulatory uncertainty in the U.S. CBD market. Defendant Kennedy said in prepared remarks that "Tilray is also working with ABG to commercialize other brands in Europe, by early 2020." Defendant Kennedy also said that "[w]e will continue to build a platform of brands and products through acquisitions and partnerships, such as [] Authentic Brands Group, [] which we expect to launch CBD products by the end of the year."

161.    Then, asked about the steps Tilray was taking to sell CBD in the US, defendant Kennedy stated:

> It's something that we are focused on building – continuing to build out the team that will execute on that strategy. There's still a lot of retailers in the US that will not – they will not buy or they won't sell, they won't stock products that contain CBD and are edible or digestible. And so nutritional supplements, dietary supplements. They're waiting for some clarification from the FDA. And that's where a large part of the market in the US is right now in terms of digestible products. And so, they're sort of at the starting block waiting to be able to sell those products.
>
> ***On the other hand, there are retailers who are interested in selling topical products that contain CBD. It's why with the ABG agreement the first product that we are introducing there are topicals.*** And then generally the smaller retailers in the US, some of the smaller sort of health and wellness focused grocery retailers, are stocking some digestible edible CBD products. But it's still growing gradually. And so, we are out meeting with those buyers and introducing them to the ABG [] products. But even they are waiting a bit to see what sort of clarification comes from the FDA.

162.    Thus, even if Tilray did not need to impair the ABG Agreement on its Q1 or Q2 2019 10-Qs, it would still have to impair it on the Q3 2019 10-Q because: (a) the Former Directors stated that Tilray did not expect significant US CBD sales in 2020 and that this prediction was incorporated into its financial model; (b) GAAP requires companies to impair intangible assets when they know facts showing that the discounted cash flows from the asset are less than the

asset's carrying value; (c) Tilray did not impair the ABG Agreement; (d) the Former Directors would cite exactly the same facts to impair the value of the ABG Agreement in Q4 2019 which they cited in Q3 2019; (e) the Former Directors stated that Tilray and ABG would among other things shortly introduce ABG-branded products in the EU and topical products in the U.S.; and therefore (f) the Former Directors gave the misleading impression that the delays in the CBD market in the U.S. did not materially reduce the value of the ABG Agreement.

163.   Analysts were encouraged by the disclosures. A Cantor Fitzgerald analyst wrote in a November 15, 2019 report that "[w]e have an outperform rating on [Tilray]. We believe that access to strong and established U.S. brands [] position[s] [Tilray] to capitalize on the industry's robust growth."

164.   On November 12, 2019, the Former Directors caused Tilray to file its Q3 2019 10-Q. The Q3 2019 10-Q provided:

> *Inventory*
>
> Inventory is comprised of raw materials, finished goods and work-in-progress such as pre-harvested cannabis plants and by-products to be extracted. The costs of growing cannabis including but not limited to labor, utilities, nutrition and irrigation, are capitalized into inventory until the time of harvest.
>
> Inventory is stated at the lower of cost or net realizable value, determined using weighted average cost. Cost includes expenditures directly related to manufacturing and distribution of the products. Primary costs include raw materials, packaging, direct labor, overhead, shipping and the depreciation of manufacturing equipment and production facilities determined at normal capacity. Manufacturing overhead and related expenses include salaries, wages, employee benefits, utilities, maintenance and property taxes.
>
> ***Net realizable value is defined as the estimated selling price in the ordinary course of business, less reasonably predictable costs of completion, disposal and transportation.*** At the end of each reporting period, the Company performs an assessment of inventory obsolescence to measure inventory at the lower of cost or net realizable value. Factors considered in the determination of obsolescence include slow-moving or non-marketable items.

165.    The Q3 2019 10-Q set out the following financial metrics:

| Revenue | $51.1 million |
|---|---|
| Cost of Sales ($) | $35.2 million |
| Gross margin ($) | $15.9 million |
| Gross margin (% of revenue) | 31% |
| Inventory | $111.5 million |
| General & administrative expenses ($) | $20.0 million |
| General & administrative expenses (% of revenue) | 39% |

166.    The Former Directors' statements were false because: (a) Tilray recognized marijuana plant trim as inventory; (b) there was no legal market for marijuana plant trim; (c) under GAAP, Tilray could not recognize marijuana plant trim as inventory because there was no immediate use for it; (d) marijuana plant trim might never become sellable if, for example, Canada did not legalize marijuana plant-based trim in Cannabis 2.0, or a market for Cannabis 2.0 products did not develop, or customers showed no interest for trim-based Cannabis 2.0 products (as opposed to flower- or bud-based products), or if the market that developed was so flooded with trim that Tilray's trim was nearly worthless; (e) Tilray was not recognizing the value of marijuana plant-based trim "as the estimated selling price in the ordinary course of business" because marijuana plant-based trim could not be sold in the ordinary course of business; and (f) as a result of (a)-(e), the Former Directors overstated both Tilray's inventory and gross margins.

## VIII.   THE TRUTH BEGINS TO EMERGE

### A.    The Former Directors Renegotiate the ABG Agreement

167.    On January 30, 2020, the Former Directors announced that Tilray had renegotiated the ABG Agreement. The renegotiated agreement released ABG from its obligation to make guaranteed minimum annual payments. Instead, the renegotiated agreement provided that ABG would ***not*** pay the first $10 million that would otherwise be due under the ABG Agreement each year. Thus, Tilray would only start earning Revenue Interest when sales reached a level that would

otherwise entitle it to $10,000,001 in payments from ABG. In exchange, ABG released Tilray from its obligation to pay Additional Consideration of $83.3 million in cash or stock. The news surprised stockholders because the Former Directors had boasted that the guaranteed annual payments were a key provision that aligned ABG's incentives with Tilray's and suggested difficulties with the ABG Agreement.

168.    On January 30, 2020, the price of Tilray's shares fell from their previous close of $19.22 per share to close at $17.54 per share, down nearly 9%.

**B.    The ABG Agreement Is Impaired by 86% and the Value of Tilray's Inventory Is Reduced by 44%**

169.    On March 2, 2020, the Former Directors caused Tilray to file its 10-K for the year ended December 31, 2019, and held a conference call to discuss its Q4 2019 results ("Q4 2019 Statements").

170.    The Former Directors claimed in the Q4 2019 Statements that Tilray had impaired the ABG Agreement by $102.6 million, or 85.9% of its value, because of regulatory uncertainty in the U.S for CBD.

171.    The impairment surprised analysts and stockholders. As an analyst employed by Jefferies wrote in a March 3, 2020 report that the "Key Takeaway" from Tilray's Q4 2019 results was:

> **"Little to get excited about on Q4 with sales/[gross margin]/EBITDA all worsening sequentially, significant impairments on both inventories/ABG agreement [and two other factors]."**

Later in the report, the Jefferies analyst commented: **"[t]rust ultimately needed for rerating:** [] [U]ltimately, we think Tilray also needs to address trust and credibility before re-rating. *We would flag [] universally positive comments before today on ABG[.]*". The analyst added that "the

market is unlikely to believe until it sees." (first and second emphases in original; third emphasis added).

172.    In truth, the ABG Agreement was impaired because it was a reckless $100 million throw of the dice, it was proposed and negotiated and all due diligence completed in a few days, and had only ever been worth a fraction of what Tilray paid for it, as the Former Directors had realized at the time.

173.    Tilray also reduced the value of its inventory as of December 31, 2019 by $68.6 million, or 44% of the value of the Company's total inventory at the time.

174.    On March 3, 2020, the price of Tilray's shares fell from its previous close of $15.35 per share to close at $13.02 per share, down more than 15%.

175.    On March 4, 2020, even as overall stock prices and the prices of other cannabis companies rose substantially, the price of Tilray's shares fell from its previous close of $13.02 per share to close at $12.51 per share, down nearly 4%.

176.    Summing up, an analyst employed by Cantor Fitzgerald wrote in a March 3, 2020 report that: "[w]e continue to think Tilray's disclosure is the worst among the Canadian [cannabis Licensed Producers] that we track."

### C.    The Former Directors Admit Tilray Did Not Follow GAAP

177.    In Tilray's 2019 10-K filed March 2, 2020, and signed by defendants Kennedy, Auerbach, Dopp, Greenwood, and St.Clare, the Former Directors explained that Tilray wrote inventory down because a market for marijuana oils did not develop after Canada legalized edibles and beverages in December 2019:

> We incurred inventory valuation adjustments primarily for cannabis oil products, which did not have the sell through opportunity, as many cannabis derivative products were not available for sale under the regulatory framework until December 2019, resulting in a significant accumulation of cannabis oil and cannabis

by¬product to be converted into oil. The total inventory valuation adjustment of $63.5 million (C$82.6 million) reflects our estimate of excess product based on current sales forecasts, which have been reduced from previous estimates due to the slower than expected transition of the Canadian adult use market than expected.

178.   Thus, the Former Directors admitted that they had been valuing trim as inventory based on an expectation that a market would develop, rather than based on the existence of a market.

179.   Then, on May 11, 2020, after the end of the Relevant Period, defendant Kennedy admitted that their recognition of byproduct as inventory meant Tilray's gross margins did not reflect its true "cost structure".

The other thing that I would mention about our gross margins is that we'll probably see a little bit of pressure on that due to the fact that we're accounting for our byproduct on a zero basis. And so I guess **historically what's happened is that byproduct has been built up on the balance sheet and that's why there have been significant write-offs for us as well as for I guess in our industry, other industry players. And what we're doing is we're – except for a few instances, we are attributing zero value to that byproduct. So everything that we sell will have all the cost structure associated with it so that we don't have any write-offs at the end of the year.**

180.   Defendant Kennedy's statement contained three key admissions. First, defendant Kennedy admitted that Tilray had been valuing unsellable derivatives on its balance sheet with the hope that Tilray could sell it later if a market developed. Under GAAP, inventory cannot be recognized unless there is a currently existing market. Materials that might be sold if a market develops are contingent gains. Thus, defendant Kennedy admitted to violating GAAP. Second, defendant Kennedy admitted that Tilray's strategy had been to recognize byproduct as inventory and write it off at the end of the year. This policy, too, violates GAAP: the value of inventory must be measured every time it is placed on financial statements. And third, defendant Kennedy admitted that because of Tilray's policies, its cost of sales did not reflect its true "cost structure".

Thus, defendant Kennedy admitted to two policies that violated GAAP and admitted that the two policies made Tilray's financial statements misleading.

### D. Tilray's "Favorite Metric" Is Extracts Revenue

181. The Former Directors fixated their attention on extracts and the byproduct used to produce them. In an August 2018 "Reddit Ask Me Anything" discussion, defendant Kennedy told stockholders that extracts revenue is Tilray's "favorite metric" and something it "pay[s] very close attention to":

> Question: If you would have to nominate your favorite financial metric that is of most importance to you and where you pay a lot of attention to, to get it right - which one would it be?

> **Defendant Kennedy**: ***Our favorite metric is extracts revenue. We believe that the future of both medical and adult use cannabis will be in various value-add, non-combustible form factors. So that's one metric we pay very close attention to*** in addition to all of our other KPIs [Key Performance Indicators] discussed in our prospectus.

## IX. BUT FOR COVID-19, DEFENDANT KENNEDY'S FALSE STATEMENTS WOULD HAVE GIVEN HIM CONTROL OVER THE WORLD'S LARGEST CANNABIS COMPANY

### A. Step 1: Defendant Kennedy Makes False Statements to Obtain Personal Control Over Tilray

> #### 1. *Defendant Kennedy and Two Close Associates Control Tilray While Owning Less Than a Third of Tilray's Shares*

182. Even as the Former Directors made false statements, defendant Kennedy contemplated and then entered into a transaction that would give him and the other two Controlling Shareholders personal control over Tilray while avoiding taxes.

183. Defendant Kennedy, alongside friends and close associates Michael Blue and Christian Groh, founded Privateer in 2011. In 2014, the Controlling Shareholders established Tilray's predecessor as a Privateer portfolio company.

184.   In January 2018, a Privateer reorganization created Tilray in its current form. Privateer was issued 75 million shares of Tilray in exchange for the assets of Tilray's predecessor. Of these, 16,666,667 were Class 1 supervoting shares, each entitling the holder to 10 votes, and 58,333,333 were Class 2 ordinary shares, each with one vote.

185.   In July 2018, Privateer took Tilray public through an IPO. Tilray sold about 9 million new Class 2 shares to the public. At the time of the IPO, non-Privateer shareholders held slightly less than 8 million Class 2 shares. The IPO left Privateer with 93% voting power over Tilray, but only an 82% economic interest.

186.   Just before the Share Exchange, although the Controlling Shareholders only held 29% the economic interest in Tilray, they were its controlling shareholders because they held 71% of the voting power over Privateer which in turn held more than 90% of the voting power over Tilray.

187.   Exercising indirect control over Tilray through Privateer came with several disadvantages for the Controlling Shareholders. First, the Controlling Shareholders had to exercise control through Privateer. Yet Privateer's charter provided that for several kinds of decisions, its supervoting shares would not receive extra votes, meaning that the Controlling Shareholders would not control Tilray or Privateer for those decisions. Second, the Controlling Shareholders would not receive much of the proceeds from selling Privateer's Tilray stock. Sales proceeds would be distributed pari passu to Privateer investors based on their economic interest in Privateer. Thus, to receive proceeds equivalent to selling one personally-held share, the Controlling Shareholders had to sell three Privateer-held Tilray shares. Third, because Privateer held more than 80% of Tilray's stock, any substantial sales of its shares would dramatically increase the number of Tilray shares

available for trading. The mere suspicion that it might sell its shares would drive down Tilray's stock price.

188.    And fourth, any sales of Privateer's Tilray stock would be subject to double taxation. When Privateer sold its shares, it would have to pay 21% taxes on its profits. Because Privateer's cost basis for its Tilray shares was approximately $0.43, it would pay taxes on substantially all of the sales proceeds. Then, when Privateer distributed cash to its investors, they would have to pay long-term capital gains taxes of 23.8% on their distribution.

189.    If he sought to monetize his interest, defendant Kennedy would face a tax bill of more than 40% of the proceeds. If they sold all their Tilray shares at the $17/share IPO price, the Controlling Shareholders would collectively face a tax bill of more than $100 million.

      *2.    Defendant Kennedy Avoids Taxes While Securing Corporate Control Over Tilray*

190.    The Controlling Shareholders hatched and implemented a scheme that would (a) eliminate Privateer's corporate sales tax, (b) control the flow of Privateer investors' Tilray shares into the market, and (c) secure personal control over Tilray ("Share Exchange").

191.    The Share Exchange had four elements:

a.    Tilray cancels all of Privateer's Tilray shares;

b.    Tilray acquires all of Privateer's shares;

c.    Tilray issues new shares to Privateer investors in proportion to their economic interest in Privateer, but all its supervoting shares are issued to the Controlling Shareholders; and

d.    Privateer investors agree to a two-year lockup.

192.    To obtain personal control over Tilray, the Controlling Shareholders needed Privateer investors' consent. While other Privateer investors would only receive Class 2 ordinary

shares, the three would receive all of Privateer's Class 1 supervoting shares. Giving effect to the Share Exchange would leave the Controlling Shareholders with only 31% of the economic interest in Tilray but 73% of its voting power. Thus, the Controlling Shareholders would maintain personal majority control over Tilray with a hefty margin to sell their own Tilray shares or have Tilray issue new shares to raise proceeds or pay for acquisitions.

193.    Article IV(E)(2) of Privateer's Charter would have to be amended to permit Privateer to distribute all Class I Tilray shares to the Controlling Shares because it required that all in-kind distributions to Privateer investors be pari passu. Article IV(D)(2)(b)(i) required a majority of shares, without regard to supervoting status, for any such amendment. Thus, defendant Kennedy needed the support of investors holding a majority of Privateer's shares to proceed with the Share Exchange on terms that gave the Controlling Shareholders personal voting control over Tilray.

194.    The terms of the Share Exchange made it clear that defendant Kennedy valued control. Defendant Kennedy could terminate the Share Exchange if of the other Privateer investors declined to award him and the other Controlling Shareholders all the supervoting shares.

195.    Privateer investors, moreover, had other options to stymie the Share Exchange. Under Delaware law, the Share Exchange gave Privateer investors a right to appraisal of their Privateer shares. Privateer non-controlling investors accounted for more than half the economic interest in Tilray. Tilray could not afford to buy back more than half of its share capital. Further, the belief that other Privateer investors would exercise their appraisal rights could create the equivalent of a bank run, as investors concerned that Tilray faced too many appraisals to be viable were pushed to seek appraisal themselves.

196.    The Controlling Shareholders asked Privateer investors to agree to a substantial burden. Privateer investors had invested their money as early as 2011. Tilray had succeeded, but

Privateer investors had not been able to sell their shares. Now, the Controlling Shareholders were asking Privateer investors to agree to two more years of lockup.

197.    Tilray was a risky investment. Tilray was and is a young, unprofitable company operating in a nascent, quick-moving industry. Tilray's stock price was volatile because it was based not on what profits Tilray was making right now but rather investors' expectations of how profitable it could become in the future. Tilray's stock price might increase in the following years, but it could also crash. With a two-year lockup, Privateer investors could not sell their Tilray shares if the investment grew too risky for them, or if they wanted to make a profit.

198.    The Former Directors' false statements were of the type that would reassure anxious Privateer investors. By overstating Tilray's gross margins, the Former Directors made it seem that it would be relatively simple for Tilray to become profitable. And by concealing that the ABG Agreement was a publicity stunt, defendant Kennedy helped convince Privateer investors that Tilray was succeeding at the very strategy he had publicly touted: developing branded products. The Former Directors' false statements helped convince Privateer investors to vote their shares in favor of the Share Exchange.

199.    And the statements were perfectly timed to influence Privateer investors. Privateer sent Tilray a letter of intent regarding the Share Exchange on January 9, 2019, a week before Tilray announced the ABG Agreement. The Share Exchange closed on December 12, 2019. A month later, Tilray would announce that it had renegotiated the ABG Agreement to remove the guaranteed $10 million payments and reduce its scope. Less than three months later, Tilray would impair the ABG Agreement by 86% and reduce the valuation of its inventory by $68 million, or 44% of its total value. And, as further set out below, the Former Directors only corrected their misstatements when Aphria was about to find out about them in its due diligence.

3.    *Step 2: Defendant Kennedy Uses His Control to Pursue a Merger That Would Have Him Head the World's Largest Cannabis Company, Nearly Succeeds, But Fails Because of COVID-19*

    i.    Defendant Kennedy Nearly Succeeds in Making Himself CEO of the World's Largest Cannabis Company

200.    The Former Directors told stockholders that cannabis was a nascent market that would quickly reach enormous size. Tilray's IPO Registration Statement provided:

> We believe we are witnessing a global paradigm shift transforming the multibillion dollar cannabis industry from a state of prohibition to a state of legalization, but the legal market is still in its early stages. Moreover, we expect the number of countries with legalized regimes to continue to increase, creating numerous and sizable opportunities for market participants, including us. According to the United Nations, the global cannabis market, including the illicit market, is estimated to be $150 billion, annually, and approximately 3.8% of the adult population, or over 180 million people, are estimated to be cannabis users.

201.    The Former Directors told stockholders Tilray aimed to be one of the largest companies in this market.

202.    In an August 2, 2018 "Reddit Ask Me Anything" discussion, defendant Kennedy stated that: "We are building a global company to be a market leader over the long-term, and appreciate that many of our investors will be with us for the long haul."

203.    On Jim Cramer's *Mad Money* television program on September 18, 2018, defendant Kennedy stated that: "Our intent is to build a company that dominates part of this $150 billion industry. I think you'll see multiple hundred billion-dollar companies. We don't want to partner with ABI [AB Inbev, a beer conglomerate]. We want to build ABI."[9]

204.    On December 20, 2018, defendant Kennedy told *Yahoo! Finance* that:

> It's early days in this industry and we're not interested in being bought or acquired, unlike two of our competitors in Canada who have been bought by Ultra and Constellation. We control our own destiny and that's one of the things I'm most proud of. You know, we want to continue to partner with other global pioneers who

---

[9]    In January 2019, Tilray partnered with ABI.

are leaders in their respective sectors, but we think it's way too early to give up control of our own destiny.

205.    On May 5, 2019, defendant Kennedy told *Marijuana Venture* that:

[T]his is a global paradigm shift, and while many companies look at it myopically, in terms of their corner of the world or their niche within cannabis, we really look at cannabis legalization as a global event. Companies with trusted brands and a multinational supply chain will be the companies that win.

206.    On the Q2 2019 earnings call, defendant Kennedy told stockholders not to focus on Tilray's profitability because it was trying "to dominate [the] global [cannabis] industry":

If your company is [] small to midsize [] those companies should be focused on profitability. But you only see an opportunity like this once in your lifetime. And if you're trying to dominate a global industry, you'd be constraining yourself if you were focusing entirely on profitability at this point. Globally, it's very early in the emergence of a $200 billion industry. And globally, if now is not the time to invest, I don't know when is.

207.    And defendant Kennedy was clear as to exactly what Tilray needed to do to survive: become one of the three or four companies that, he claimed, would dominate the cannabis industry.

208.    At the November 4, 2015 Web Summit in Dublin, defendant Kennedy stated that "Cannabis is the only thing we put into our bodies that is not branded in any way. That will change."

209.    On October 16, 2019, defendant Kennedy told *Weed on Wall Street* that he wanted to build a "massive" cannabis company:

And I tell our employees, I tell our investors that this is just day one. I think globally, this is $150 to 200 billion industry. We're investing for the future, we've been doing this for eight and a half years. We have a long, patient, methodical view on how to build a massive company in this industry.

210.    In a December 18, 2019 *CNBC* interview, defendant Kennedy stated that only three or four companies would dominate the cannabis industry:

Well, what I believe is that the cannabis industry globally adult-use and medical is somewhere between 150 to a $200 billion industry. And I think it ends up looking

something like the global beer industry, where three or four companies control a dominant portion, 75, 80% of that market share. And so if three companies are divvying up a 150 billion industry, they'll each have a revenue somewhere around 50 billion. And so that's how I get to, there'll be three companies that have a hundred billion valuation and we would like to be one of those companies; we're methodical, we're patient. It's early days in this industry.

211.    In a March 6, 2020 article, the *Wall Street Journal* observed that defendant Kennedy "thinks that consolidation will continue, leaving the cannabis sector looking a look a lot like the beer business, with two or three companies dominating the marketplace." It then quoted defendant Kennedy as saying "[o]ur strategy is to position ourselves so that we are one of those three companies[.]"

212.    In the August 2018 Reddit Ask Me Anything discussion, defendant Kennedy specifically linked his control of Tilray with his pursuit of an acquisition of or merger with a large company:

> We believe that our industry is evolving rapidly - and sometimes in a wacky way - and that the dual share structure will enable us to control our own destiny as opportunities develop around the world. Many of our investors are long on us as a company, believe in our management team, and want us to be able to determine our own future.

> You're already seeing Fortune 500 companies do deals in the space and I think you'll see more as the year progresses. We may be a year or two away from an acquisition, but continue to believe it's inevitable.

213.    In the fall of 2019, Tilray initiated merger discussions with Aphria, a large Canadian cannabis company focusing on the Canadian market (the "Aphria Merger"). With Aphria roughly Tilray's size, the combined company would create the world's largest cannabis business by revenues in the world.

214.    Discussions proceeded rapidly. On November 22, Aphria's CEO met with a member of Tilray's Board (defendant Kennedy could not attend because of a late-breaking conflict).

215.    Only six days later, the companies signed a mutual non-disclosure agreement.

216.    On December 18, 2019, the companies held a senior executive meeting to discuss the Aphria Merger.

217.    Thereafter, the companies made frenetic efforts to push through the Aphria Merger. On January 14, 2020, defendant Kennedy and Aphria's CEO had a further meeting. A week later, defendant Kennedy and other senior Tilray executives toured Aphria's facilities. Tilray and Aphria each engaged financial advisors. After another February 5, 2020 senior executive meeting that included financial advisors, on February 10, 2020, defendant Kennedy and other senior Tilray executives again toured Aphria's facilities.

218.    On February 14, 2020, Tilray provided Aphria a draft of a non-binding term sheet for a stock-for-stock merger. Tilray anticipated a quick closing; the term sheet proposed an exclusivity period that terminated on March 2, 2020.

219.    Defendant Kennedy's term sheet was not favorable to Tilray stockholders. His proposal would see former Tilray shareholders own only 56% of the combined company. In January and February of 2020, Tilray's market value hovered around 54-55% of the combined company's market capitalization. Before January 2020, Tilray had usually been worth more than 60% of the combined company. Defendant Kennedy's first offer did not reflect Tilray's true value.

220.    Yet it did ensure that defendant Kennedy would serve as CEO of the combined company:

> On February 14, 2020, Tilray provided Aphria with an initial draft of a non-binding term sheet regarding a potential combination of the two businesses. Mr. Kennedy and Mr. Simon had a discussion regarding the key components of the draft term sheet and potential next steps. The draft term sheet contemplated, among other things: (i) that the transaction would be structured as an all-stock merger, with shareholders of Tilray and Aphria owning 56% and 44% of the Combined Company, respectively; (ii) a governance structure that would include (A) ***Mr. Kennedy as CEO*** and [Aphria CEO] Mr. Simon as Executive Chairman, and (B) a

board of directors comprised of 8 members total, 4 directors designated by Tilray and 4 designated by Aphria; (iii) that the Combined Company would be called "Tilray"; and (iv) an exclusivity period through March 2, 2020, which was expected to coincide with the announcement of Tilray's Q4 2019 earnings. ***At this point, Tilray's stock was trading at a higher level than Aphria's stock.***

221.    On February 27, 2020, Aphria's CEO attended a Tilray Board meeting.

222.    At the time, the Controlling Shareholders continued to control Tilray. The Controlling Shareholders could, by themselves, ensure shareholder approval of the combination. Their votes meant Tilray would not have to undertake the long and uncertain process of securing stockholders' consent. Further, by ensuring a quick approval, defendant Kennedy made the combination more attractive to Aphria, a carrot he could use to make himself CEO.[10]

223.    For years, defendant Kennedy had publicly stated that the global cannabis market would run to the hundreds of billions of dollars in annual revenues and would be controlled by three or four large companies. The Aphria Merger gave defendant Kennedy a chance not only to create one of those companies but to lead it. Defendant Kennedy's goal was within his grasp.

        ii.     Defendant Kennedy's Plan All Comes to Naught Because of COVID-19

224.    On January 15, 2020, Canada activated a COVID-19 Emergency Operations Center. In early March 2020, COVID-19 ravaged Northern Italy. On March 11, 2020, the World Health Organization declared COVID-19 a pandemic. On March 13, 2020, Washington State's Governor ordered all public and private schools closed. Beginning in mid-March 2020, New York

---

[10]    Delaware courts recognize that being able to guarantee closing is a valuable asset in a merger or acquisition. *In re Topps Co. S'holders Litig.*, 924 A.2d 951, 960 (Del. Ch. 2007); *In re Cox Commc'ns, Inc. S'holders Litig.*, 879 A.2d 604, 619 (Del. Ch. 2005) (noting that in mergers, stockholders "get to protect themselves by voting no if they believe that their bargaining agent has done a poor job[.]"). Deal certainty is part of the consideration a counterparty receives in a merger.

suffered a devastating wave of infections. On March 16, 2020, all New York City schools were closed.

225.    On March 18, 2020, Aphria's CEO told the board of directors of Aphria that discussions of the Aphria Merger would be placed on hold in light of the COVID-19 pandemic. COVID-19 create havoc everywhere in the world, including in Tilray and Aphria's stock prices. With stock prices so volatile, it was not possible to create a reasonable exchange ratio for the Aphria Merger.

226.    On or about March 25, 2020, defendant Kennedy suggested to Aphria an equity ownership split of exactly 50% for Tilray and 50% for Aphria. Tilray's charter requires a favorable vote of all shares regardless of supervoting status to approve any change of control transactions. Amended and Restated Certificate of Incorporation of Tilray, Inc., IV.D.2.(c). Tilray's charter defines a change of control to include a merger where ***more than*** 50% of the shares would be held by the counterparty. Id. IV.D.1.(a). Thus, defendant Kennedy proposed the precise equity ownership split that would permit the Controlling Shareholders to force the Aphria Merger through.

227.    Over the next year, Aphria would repeatedly place the transaction on hold in light of other concerns. These discussions eventually succeeded. The Aphria Merger closed on December 15, 2020. Tilray and Aphria determined the proportion of the combined company each of their shareholders would hold by reference to their respective market capitalizations as of close of trading that day. Aphria's had grown substantially through COVID-19; Tilray's had shrunk. By then, Tilray's market capitalization was only 32.6% of Aphria's.

228.    With Aphria accounting for more than two-thirds of the combined company, Aphria's CEO naturally became the combined company's CEO. Defendant Kennedy was relegated to the role of Director.

### iii.    The Controlling Shareholders Lose Control

229.    Since the time of Tilray's IPO, its Certificate of Incorporation has provided that supervoting Class 1 shares would be converted into ordinary Class 2 shares once they accounted for less than 10% of Tilray's shares:

> "***Final Conversion Date***" means 5:00 p.m. in New York City, New York on the first Trading Day falling on or after the date on which the outstanding shares of Class 1 Common Stock represent less than ten percent (10%) of the aggregate number of shares of the then outstanding Class 1 Common Stock and Class 2 Common Stock.

*       *       *       *       *

> **Final Conversion Date**. On the Final Conversion Date, each one (1) issued and outstanding share of Class 1 Common Stock shall automatically, without any further action, convert into one (1) fully paid and nonassessable share of Class 2 Common Stock

230.    COVID-19 created uncertainty about whether Tilray could even survive. Before COVID-19, Tilray acknowledged that its ability to continue as a going concern depended on its ability to manage capital outflows. As Tilray's 2020 10-K noted:

> These financial statements have been prepared on a going concern basis, which assumes that the Company will continue in operation for the foreseeable future and, accordingly, will be able to realize its assets and discharge its liabilities in the normal course of operations as they come due. The Company's ability to continue as a going concern is dependent upon obtaining additional financing to meet anticipated cash needs for working capital and capital expenditures through the next twelve months.

*       *       *       *       *

> ***Should there be constraints on access to capital under the at-the-market program, the Company can manage cash-outflows through reduced capital expenditures and managing the operational expenses of the business that pertain to future***

*investments that are discretionary in nature. Accordingly, the Company has concluded that it is probable that it is able to implement plans that would effectively mitigate the conditions and events that raise substantial doubt about the entity's ability to continue as a going concern for the next twelve months.*

231.    Tilray's 2020 10-K accordingly did not contain a warning that there was substantial doubt that Tilray could continue as a going concern.

232.    But that was before COVID-19. As defendant Kennedy later acknowledged on Tilray's Q1 2020 earnings call, "the COVID-19 pandemic provides a level of uncertainty for Tilray and the broader industry."

233.    As a result, on March 17, 2020, Tilray was forced to sell shares on brutal terms. Tilray sold a total of 19 million ordinary shares, each with a warrant to purchase an additional ordinary share at an exercise price of $5.95, for $4.76,[11] for gross proceeds of $90 million. The offering added up to 38 million more shares to Tilray's existing 98,561,398 shares, each for a third of the IPO price.

234.    In July 2020, enough Tilray warrant holders exercised their warrants to trigger the Final Conversion Date. All the Controlling Shareholders' supervoting shares were converted into ordinary shares, eliminating their control.

235.    After that, the Controlling Shareholders could no longer deliver the votes to approve the combination.

236.    If a company's shares are largely held by discrete institutions, the company can call the institutions to ensure they vote their proxies. But Tilray's stockholder base largely consisted of retail, not institutional, investors. It cannot feasibly call a large number of small stockholders.

---

[11]    Of these, 11,750,000 million consisted of pre-funded warrants which could be exercised for a nominal sum. Purchasing a pre-funded warrant lets investors defer the tax and disclosure consequences of share ownership, but a pre-funded warrant and a share are economically identical.

237.     Stockholders were called to vote on the Aphria Merger in April 2021.

238.     Ultimately, only 69 million of Tilray's 179 million outstanding shares were voted at the Special Meeting.

          iv.     Kennedy Uses His Control Over Tilray's Board to Push Through the Aphria Merger

239.     During the Relevant Period and when stockholders voted on the Aphria Merger, Tilray's Board had five Directors. In April 2021, directors had last been elected in May 2020, when the Controlling Shareholders still controlled Tilray.

240.     Tilray stockholders challenged the Share Exchange in the Delaware Court of Chancery as a conflicted transaction. To survive the defendants' motion to dismiss, they had to allege that at least three of the three directors were conflicted.

241.     Chancellor Kathaleen St. J. McCormick ("Chancellor McCormick") ruled that three of the directors, all of whom still sat on Tilray's Board in April 2021, could not fairly consider the transaction because they were beholden to defendant Kennedy, Privateer, or both.

242.     Tilray announced it would hold a Special Meeting to vote on the Aphria Merger on April 16, 2021, at 11:00 am.

243.     On April 8, 2021, Tilray held a Board Meeting to discuss the proxy solicitation process. At the meeting, Tilray's proxy solicitor told the Board that it was unlikely that Tilray could reach quorum, citing the number of retail investors.

244.     On April 15, 2021, Tilray published a Press Release announcing the postponement of the Special Meeting to April 30, 2021.

245.     On April 16, 2021, Tilray's Board approved an amendment to Tilray's bylaws to reduce the quorum requirement for shareholder meetings from one half to one third of all votes.

246.    Had Tilray's directors not amended the charter, the 69 million shares voted at the meeting would not have sufficed to secure a quorum.

>    v.    The Share Exchange Had to Be Completed Before the Aphria Merger

247.    Chancellor McCormick's ruling that defendants Greenwood, Auerbach and Kennedy were conflicted triggered the entire fairness standard. On that question, Chancellor McCormick ruled that the transaction was not entirely fair to Tilray minority shareholders because Tilray had enormous leverage over the Controlling Shareholders but failed to use it. *In re Tilray, Inc. Reorganization Litig.*, No. CV 2020-0137-KSJM, 2021 WL 2199123, at *15 (Del. Ch. June 1, 2021). The Controlling Shareholders could secure these benefits because they controlled Tilray.

248.    Were Tilray to merge with Aphria before the Share Exchange, the Controlling Shareholders could not secure terms as beneficial. After the Aphria merger, Tilray would not be subject to their control. With an uncontrolled negotiating partner, the Controlling Shareholders could not secure a deal nearly as sweet.

249.    Further, the corrective disclosures needed to be made before, not after, the Aphria Merger. The Aphria Merger was a multi-billion-dollar transaction. Aphria would naturally request, and expect, copious due diligence, particularly on accounting topics. The Former Directors could not hope to hide from Aphria the "bags and bags, boxes and boxes" of trim that made up 44% of Tilray's inventory. Nor could they hide that the ABG Agreement was illusory.

250.    Thus, the Former Directors disclosed the skeletons in Tilray's closet just as Aphria was about to look through it.

## X.    DEFENDANT KENNEDY SOLD OVER $28.3 MILLION WORTH OF TILRAY STOCK DURING THE RELEVANT PERIOD

251.    During the Relevant Period, defendant Kennedy sold 643,164 personally-held shares of Tilray stock for a total of $28,389,051.71 in proceeds:

*See* Table on the following pages.

[*Remainder of Page Intentionally Left Blank*]

| Type of transaction[10] | Date | Shares sold (received) | Price | Total proceeds |
|---|---|---|---|---|
| Restricted stock vesting | January 23, 2019 | (375,000) | 0 | 0 |
| Stock sale | January 24, 2019 | 149,916 | $74.21 | $11,125,266.36 |
| Exercise of stock options | March 1, 2019 | (50,000) | $7.76 | ($388,000) |
| Open market sales | | 53,897 | $79.49 | $4,284,272.53 |
| | | 14,437 | $80.40 | $1,160,734.80 |
| | | 7,454 | $81.67 | $608,768.18 |
| | | 11,351 | $82.14 | $932,371.14 |
| Exercise of stock options | April 1, 2019 | (50,000) | $7.76 | ($388,000) |
| Restricted stock vesting | | (47,875) | 0 | 0 |
| Open Market Sales | | 52,758 | $63.03 | $3,325,336.74 |
| | | 32,539 | $63.84 | $2,077,289.76 |
| | | 1,842 | $64.73 | $119,232.66 |
| | | 18,970 | $63.78 | $1,209,906.60 |
| Grant | May 31, 2019 | (76,000) | 0 | 0 |
| Vesting of restricted stock units, net of shares withheld by Tilray to pay taxes on conversion | July 1, 2019 | (30,472) | 0 | 0 |
| Vesting of restricted stock units, net of shares withheld by Tilray to pay taxes on conversion | October 1, 2019 | (28,414) | 0 | 0 |
| Open market sale | December 11, 2019 | 100,000 | $18.30 | $1,830,000.00 |
| Vesting of restricted stock units, net of shares withheld by Tilray to pay taxes on conversion | January 1, 2020 | (32,986) | 0 | 0 |

[12]

---

[12]    Excluding receipt of shares subject to a lock-up agreement.

| Open market sales | January 13, 2020 | 29,593 | $15.52 | $459,283.36 |
|---|---|---|---|---|
| | | 67,113 | $16.74 | $1,123,471.62 |
| | | 3,294 | $17.34 | $57,117.96 |
| Exercise of stock options | February 13, 2020 | (100,000) | ($7.76) | ($776,000) |
| Open market sale | | 100,000 | $16.28 | $1,628,000.00 |
| Total sales | 643,164 | | | |
| Total net sales | (147,583) | | | |
| Total proceeds | $28,389,051.71 | | | |

252.    Defendant Kennedy's stock sale proceeds were almost pure profit. Defendant Kennedy got his shares from Privateer's initial investment in Tilray in 2014. At the IPO price of $17/share, Privateer's shares were worth $1.275 billion. Of this, $1.242 billion was profit. Thus, defendant Kennedy's purchase price for the shares he sold was a small number of pennies per share.

253.    The timing of defendant Kennedy's stock sales was highly suspicious. Defendant Kennedy made his largest sales, by proceeds, within a week of the beginning of the Relevant Period. Defendant Kennedy made his largest sales, by number of shares sold, in the last months of the Relevant Period, just before the corrective disclosures.

254.    Defendant Kennedy's sales were all the more unusual because they violated a prior pledge not to sell shares.

255.    On January 6, 2019, defendant Kennedy told *Fortune* that he had not sold any of his Tilray shares. *Fortune* also reported that defendant Kennedy "promises he won't [sell shares] when post-IPO restrictions lift in January". The *Fortune* article was published on January 16, about a week before Kennedy sold $11,125,116.44 in shares.

256.    Indeed, in an October 17, 2018, interview with *Bloomberg*, defendant Kennedy had linked his lack of stock sales to his confidence in Tilray:

**Q**: Those big gains that we've seen in Tilray stock since the IPO. I'm curious, have you sold any of your own stock?

**Defendant Kennedy**: Zero.

**Q**: Zero? Have you been a buyer of any more?

**Defendant Kennedy**: There was a public disclosure of a share purchase on the date of an IPO. So I was a buyer at the IPO.

**Q**: All right. So you're holding on to the shares.

**Defendant Kennedy**: ***I haven't sold a share, don't expect to sell a share. I've been doing this for eight years. I have a long-term view of the opportunity. It's a global growth opportunity. While today is a historic day, it is day one and we expect to be in this industry for a very long time and grow a very large company*** that not only is successful and obtain significant market share in Canada but gains significant market share in other medical cannabis countries and other adult-use countries around the world.

257. Finally, these sales amounted to a large part of the common shares that were available to sell. Because Privateer held so many of Tilray's shares, its tradeable float was relatively small. At the beginning of the Relevant Period, only about 17 million Tilray shares were freely tradeable and not held by Privateer. Defendant Kennedy's large stock sales would not only signal his lack of confidence, they would significantly increase the number of tradeable Tilray shares, thus reducing their price.

## XI.    ADDITIONAL SELF-DEALING

258. The Controlling Shareholders had previously used their control over Tilray to benefit themselves at Tilray's expense.

259. As of the end of 2018, Tilray licensed seven of its ten Canadian recreational marijuana brands from Privateer and its former subsidiaries.

260. In July 2019, defendant Kennedy faced a significant personal tax bill. To secure the cash necessary to pay the bill, defendant Kennedy caused Tilray to purchase Smith & Sinclair,

Ltd., which was 30% owned by Privateer. In 2019, Smith & Sinclair lost $2.7 million on revenues of $1.6 million.

261.   Tilray paid approximately $2.4 million for Privateer's stake. Privateer then distributed the $2.4 million directly to defendant Kennedy without paying anything to other Privateer investors. For the 70% not owned by Privateer, Tilray paid 79,289 shares and approximately $2 million in contingent consideration.

262.   In its next audited financial statements, Tilray re-measured the value of the contingent consideration to $420, showing that the contingent consideration was a mere fig-leaf to conceal that Tilray was paying a disproportionate price for Privateer's interest. Tilray's re-valuation of the contingent consideration to *precisely* $420 (a prominent reference in the cannabis community)[13] suggests the contingent consideration was, and had always been, a joke at the expense of shareholders whose cash defendant Kennedy appropriated for himself.

263.   Tilray and Privateer share office space at 2701 Eastlake Avenue E, Seattle, WA 98102. From January 2019 through May 2019, Tilray made payments towards Privateer's lease of these joint offices. In May 2019, Tilray paid Privateer $1 million and assumed the lease. Tilray's financial statements do not record any subsequent payments from Privateer for lease, yet the Controlling Shareholders continue to work on Privateer business out of the shared Tilray and Privateer offices.

264.   In January 2020, Tilray entered into an agreement with Privateer Management, pursuant to which it provided certain general and administrative and corporate services on an as-requested basis for a monthly cost of $17,500. This agreement remained in effect until April 30,

---

[13]   *In re Tesla, Inc. Sec. Litig.*, 477 F. Supp. 3d 903, 923 n.10 (N.D. Cal. 2020); Maureen Meehan, *Fifty Years of 420 and The Waldos: Time Flies When You're Having Fun*, available at https://hightimes.com/culture/fifty-years-420-waldos/.

2020. In August 2020, Tilray entered into a similar agreement with Privateer Management for certain accounting services for a monthly cost of $25,000, which terminated in October 2020. In 2020, Tilray paid Privateer Management an aggregate of approximately $71,000 under these two agreements.

## XII.   TILRAY USES ITS STOCK AS CURRENCY FOR ACQUISITIONS

265.   Tilray used its stock to acquire companies:

    a.   Tilray issues 1,680,214 shares in connection with the ABG Agreement;

    b.   In February 2019, Tilray issued 180,332 shares in connection with its acquisition of Natura Natural Holdings Inc.

    c.   In mid-2019, Tilray issued 2,109,252 shares in connection with its acquisition of Manitoba Harvest;

    d.   In July 2019, Tilray issued 79,289 shares in connection with the acquisition of Smith & Sinclair Ltd.

    e.   In September 2019, Tilray issued 354,049 shares in connection with three transactions.

## XIII.   THE VOLUME OF TRADING IN TILRAY'S STOCK INCREASES SUSPICIOUSLY AFTER THE SHARE EXCHANGE

266.   Privateer investors were required to sign a lockup agreement to receive Tilray shares in the Share Exchange ("Privateer Lockup"). Each lockup agreement provided:

> [T]he undersigned holder of Privateer Capital Stock and/or options to purchase Privateer Capital Stock is required to execute and deliver this Lock-up Agreement as a condition to the receipt of such holder's portion of the Total Merger Consideration. In light of the benefits that the Merger will confer upon the undersigned, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned pursuant to the Merger Agreement agrees with the Company that, during the period beginning on the Closing Date through and including the second anniversary of the Closing Date, **the undersigned will not, without the prior written consent of the Company,**

*Transfer, or announce the intention to Transfer, any shares of Class 1 Common Stock of the Company, par value $0.0001 per share, or Class 2 Common Stock of the Company, par value $0.0001 per share (collectively, the "Common Stock"), that constitute Stock Merger Consideration* (including, without limitation, Common Stock which may be deemed to be beneficially owned by the undersigned in accordance with the rules and regulations promulgated under the Securities Act of 1933, as amended (the "Securities Act"), (such shares, the "Beneficially Owned Shares")) or securities convertible into or exercisable or exchangeable for Common Stock that constitute Option Merger Consideration (collectively, such Common Stock and other securities, the "Merger Consideration Securities").

267.   The Privateer Lockup categorically prohibited all unsanctioned sales during the first year after the Share Exchange closed:

The restrictions set forth herein shall lapse as follows:

(1) as of the first anniversary of the Closing Date, the restrictions with respect to 50% of the Applicable Securities shall lapse (for purposes of clarification, all Cash Consideration Shares and all Permitted Sales shall be credited towards and deemed to be included in such 50% lapse) []

268.   The Privateer Lockup provided a limited exception for "Permitted Sales". These sales had to be authorized by Tilray's Board:

"*Permitted Sale*" shall mean a sale of Merger Consideration Securities (i) in any Offering or (ii) following the Closing, in any other registered public offering, block trade or strategic sale *approved or arranged by the Company, in each case at the discretion of the Board of Directors of the Company* (subject to the Company's policies regarding approval of affiliate transactions).

269.   Further, a Permitted Sale was material non-public information, such that the Company had to disclose its existence:

The undersigned acknowledges and agrees that information regarding any Offering or any other Permitted Sale will constitute "material non-public information" pursuant to applicable securities Laws.

270.   Thus, no former Privateer investor could sell any Tilray shares received in the Privateer Agreement without Tilray's Board's authorization and public disclosure of the sale.

271.    Tilray did not disclose any Permitted Sales during the remainder of the Relevant Period.

272.    Yet shortly after the Privateer Agreement, trading volume in Tilray shares soared:



273.    On average, approximately 1.8 million shares traded daily during the Relevant Period. The average trading volume for the 90 days preceding the closing of the Privateer Agreement was also approximately 1.8 million shares. The average trading volume from the date of the Privateer Agreement through the close of the Relevant Period was 3.6 million shares.

274.    On January 14 and 15, 2020, 30 million Tilray shares were traded. At the time, only approximately 25.2 million shares were authorized for trading.

275.    The Privateer Lockup provided that the Tilray shares provided to investors as part of the Privateer Agreement would bear a legend indicating that the shares could not be resold:

> ***The undersigned hereby consents to the placing of legends on the certificates representing the shares of Common Stock issued as, or received upon the conversion of, the Merger Consideration Securities or the entry of stop transfer instructions with the Company's transfer agent and/or any other duly appointed transfer agent of the Company with respect to any Merger Consideration Securities.*** In furtherance of the foregoing, the Company and any other duly appointed transfer agent of the Company for the registration or transfer of shares of Common Stock are hereby authorized to decline to make any Transfer of shares of Common Stock if such Transfer would constitute a violation or breach of this Lock-up Agreement.

276.    Accordingly, it would have been difficult or impossible for Privateer investors to sell the Tilray shares they received through the Privateer Agreement.

277.     Thus, any Permitted Sales were authorized by Privateer's Board, but not disclosed to the public in violation of the Privateer Lock-Up's terms. At the time, the Controlling Shareholders continued to hold majority control over Tilray.

278.     The definition of Permitted Sale in the Privateer Lock-Up provides:

> The Company will only conduct a Permitted Sale to the extent that each applicable Former Holder shall have an opportunity to sell a portion of his, her or its Merger Consideration Securities on a proportionate, pro rata basis relative to all other applicable Former Holders.

279.     Accordingly, the Controlling Shareholders would share proportionally in any Permitted Sales after the Share Exchange.

## XIV.   DAMAGES TO TILRAY

280.     As alleged above, the Former Directors' statements and the events described herein gave rise to the Securities Action being initiated against the Company, which has since been sustained in material part.

281.     Tilray has suffered additional damages as well.  For example, Tilray is suffering, and will continue to suffer, from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in improper behavior and have misled the investing public, such that the Company's ability to raise equity capital or debt on favorable terms in the future is now impaired.  Further, as the Securities Action and other related litigation continues to unfold, Tilray will be continue to be damaged by the professional fees, costs and expenses incurred because of those matters, not to mention the decline in productivity associated with the distractions that come with exposure to litigation.

282.     The Former Directors have not fared nearly so badly, however.  On the contrary, as alleged herein, certain of the Former Directors have pocketed millions of dollars in compensation not justified by the Company's performance while under their stewardship, especially defendant

Kennedy.  The Company has also incurred costs in connection with benefits paid to these Former Directors.

## XV.    THE SECURITIES ACTION

283.    Shortly after the truth emerged, the Securities Action was filed in the U.S. District Court for the Southern District of New York. By the MTD Order dated September 28, 2022, Judge Crotty denied Tilray's and defendant Kennedy's motion to dismiss in significant part. Judge Crotty upheld claims that Tilray and defendant Kennedy violated federal securities laws relating to: (i) false statements overvaluing inventory materials which had negligible value, and (ii) false statements touting the value of the ABG Agreement.

284.    Regarding the false inventory claims alleged in the Securities Action, Judge Crotty wrote the following:

> ***Plaintiffs have plausibly alleged that Defendants made false statements overvaluing materials that had negligible value.*** The former employee's allegations about essentially worthless oils that were valued between $750,000 and $7,500,000, coupled with the subsequent documenting of Tilray's inventory, demonstrate both how and why the statements were misleading. At the time the company ascribed value to the oils-each time Tilray made quarterly statements, and Kennedy approved them-those oils allegedly had negligible financial value. *See Novak v. Kasaks*, 216 F.3d 300, 304 (2d Cir. 2000) (finding falsity where defendants were "accounting for inventory that they knew to be obsolete and nearly worthless at inflated values"). ***Those statements were therefore plausibly alleged to be "false."***

MTD Order at 13.

285.    Regarding the statement that Tilray was "building its inventory", Judge Crotty also held that this representation was false:

> ***Similarly, Kennedy's claim that Tilray was "building" inventory was false because the trim had little to no value at the time it was being accumulated.*** Defendants claimed-in their 2018 10- K, Q1 2019-lOQ, Q2 2019-lOQ, and Q3 2019-lOQ-that inventory was growing significantly: from $16.2 million to $110.5 million. But when Tilray wrote down its inventory just months later in March 2020, $68.6 million of that inventory growth was revealed to have been a mirage. *Id.*

286.   Judge Crotty also noted that "the false statements in the quarterly filings violated GAAP, which further bolsters the claim that Defendants misled investors." *Id*. The order also confirms that defendant "Kennedy made statements related to the false inventory claims that were misleading. For example, the claim 'we are not going to adjust our number up' misled investors to believe that Tilray was accurately and conservatively reporting its inventory, when really the numbers were already inflated." *Id*. at 14.

287.   Judge Crotty's analysis also concluded that the ABG Agreement statements by defendant Kennedy were false. "Defendants reported in their financial disclosures that the ABG Agreement was worth $102.6 million more than it was actually worth-an objective figure." *Id*. The MTD Order also states that "the SAC sufficiently alleges that the ABG Agreement was hastily put together to arrest a falling stock price and the statements describing its potential value were false." *Id* at 15. "Further, just as the misstatements regarding inventory were false, statements related to the ABG Agreement and the company's subsequent failure to abide by GAAP render Kennedy's statements and Tilray's related filings false." *Id*.

288.   To adequately plead fraud under the federal securities laws, the plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4. With regard to scienter, any securities plaintiff must meet the high bar articulated in *Tellabs*, which requires the court to inquire whether "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 324 (2007). Judge Crotty ruled, under this exacting standard, that the operative Securities Action complaint "alleges a strong inference of scienter by explaining how Kennedy had both motive and opportunity to commit fraud." MTD Order at 15.

289.    The Securities Action claims, including those against the Tilray and Kennedy, are accordingly moving into discovery, and from there will proceed to trial.

## XVI.  PLAINTIFF'S LITIGATION DEMAND HAS BEEN CONSTRUCTIVELY REFUSED AND IGNORED BASED ON THE BOARD'S FAILURE TO TIMELY SECURE TOLLING AGREEMENTS FROM THE INDIVIDUAL DEFENDANTS, AND THIS DERIVATIVE ACTION SHOULD PROCEED

290.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

291.    Plaintiff is a current stockholder of the Company.  Plaintiff has continuously held shares of the Company's stock since 2018 and Plaintiff was a stockholder of the Company at all times relevant to the Individual Defendants' wrongdoing alleged herein.

292.    Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

293.    Tilray is a Delaware corporation.  The directors of a Delaware corporation owe the corporation and its stockholders the affirmative duty to protect the interests of the corporation at all times.  Moreover, corporate directors have an obligation to refrain from conduct that would injure the corporation and its stockholders.

294.    On February 8, 2023, Plaintiff issued a pre-suit Litigation Demand to the Board. *See* Exhibit 1.  In the Litigation Demand, Plaintiff demanded that the Board do two things.

295.    First, the Litigation Demand stated that the Board must file suit against defendant Kennedy for Breach of Fiduciary Duty, Contribution, and Indemnification.  This first demand was in response to the recent MTD Order sustaining the Securities Action in material part, arising from a series of materially false and misleading statements made during the Relevant Period by defendant Kennedy on behalf of Tilray.  To date, the Board has not taken any remedial action against defendant Kennedy. Instead, the Board has permitted the Company to fund his defense of

the securities fraud claims asserted against him by Tilray investors. Further, the Litigation Demand states that the Board must cease funding his defense.

296.    Second, the Litigation Demand states that the Board must commence an independent investigation into potential breaches of fiduciary duty and other misconduct by certain other former officers and directors of Tilray during the Relevant Period.  Specifically, the Board must undertake an independent investigation into whether former Tilray directors Greenwood, St.Clare, Auerbach, and Dopp breached their fiduciary duties in connection with the events and allegations described herein. Further, the Plaintiff demanded that should the Board's investigation conclude that any or all these individuals (or any other current or former fiduciaries of the Company, including the current Board members themselves) breached their fiduciary duties to Tilray, the Board must also institute litigation against such individuals to recover the damages their misconduct has caused the Company.

297.    To the extent that the Board might not have been prepared to promptly take the actions demanded by Plaintiff in the Litigation Demand prior to the arguable expiration of the applicable statute of limitations on March 2, 2023, Plaintiff demanded that the Board immediately secure tolling agreements from each of the individuals that were implicated or potentially could be implicated in the alleged wrongdoing, including but not limited to the Individual Defendants named herein.  Plaintiff further demanded that no later than February 23, 2023, the Board provide written confirmation that such tolling agreements had been secured or would be timely secured.

298.    The Board failed to respond to Plaintiff at all until February 27, 2023, when the Company's Global General Counsel, Mr. Gendel, sent an email to counsel for Plaintiff.  *See* Exhibit 2.  In his email, Mr. Gendel represented that "Tilray will be contacting the individuals [identified in the Litigation Demand] -- all former directors and officers -- to see if they are willing

to enter into tolling agreements.  That process will take more time than you have given us.  I will report back after I have discussed it with them."

299.    Although the Litigation Demand was issued to the Board on February 8, 2023, Mr. Gendel's email provided no indication as to why the individuals identified as wrongdoers in the Litigation Demand had not yet been contacted by the Board, or what steps, if any, the Board had taken to secure tolling agreements following receipt of the Litigation Demand.  Based on the record, it seems that the Board simply sat on its hands until at least February 27, 2023, and that it will not secure the required tolling agreements by March 2, 2023.

300.    Accordingly, it is now apparent that the Board has either acted recklessly by failing to promptly take the reasonable, basic steps necessary to ensure Tilray can timely assert its valuable claims, or worse, that the Board has deliberately chose to "run out the clock" and protect the Former Directors from the consequences of their misconduct.

301.    In either case, the Board's failure to expeditiously secure tolling agreements despite Plaintiff's explicit demand for tolling agreements under these circumstances -- as the statute of limitations for Tilray's breach of fiduciary duty claims will likely expire shortly -- amounts to functionally ignoring and wrongfully refusing the Demand and failing to protect and preserve the Company's corporate assets, in violation of the Board's fiduciary duties to Tilray and its stockholders.

302.    The Board's dereliction of duty has left Plaintiff with no choice but to initiate this derivative action at this time to ensure that the Company's valuable claims for relief based on the allegations in the Litigation Demand are properly and timely asserted.

303.    The fact remains that, but for the Former Directors' serious misconduct, including their false and misleading statements set forth at length above, the Company would not have been

named as a primary defendant in the Securities Action.  A Delaware corporation is a legal entity and, therefore, it can only act through its officers and/or directors -- here, the Individual Defendants.  Under these circumstances, the Board's clear disdain and disregard for Plaintiff's demand for tolling agreements as explicitly stated in the Litigation Demand and their own duties in connection with the Litigation Demand constitutes a constructive, wrongful refusal of the Litigation Demand.  By this derivative action, Plaintiff seeks to vindicate the Company's rights against its wayward fiduciaries -- the Individual Defendants -- since the Company's current directors either cannot or will not discharge their fiduciary duties to protect and preserve Tilray's corporate assets.

304.    The Board's conduct is antithetical to the affirmative duties of Tilray's directors to protect the interests of Tilray and to refrain from conduct that would injure the corporation.  By failing to act upon the Litigation Demand by timely securing tolling agreements from the Former Directors, the members of the Board failed in their fundamental duty and obligation to protect the corporate enterprise.  Therefore, by virtue of their own actions (or, to be more precise, their own inactions), the members of the Board have constructively and wrongfully refused the Litigation Demand.  Accordingly, Plaintiff may proceed with this derivative action which is designed to protect the interests of Tilray by, among other things, perfecting the Company's claims for relief against the Former Directors.

## **COUNT I**
**Contribution and Indemnification Under the Securities Exchange Act of 1934**
**Against Defendant Kennedy**

305.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

306.    The Individual Defendant named in this Count -- Kennedy -- is named as an individual defendant in the related Securities Action against Tilray.  The Securities Action recently survived a motion to dismiss, as Judge Crotty upheld federal securities fraud claims against Tilray and Kennedy.  The conduct of defendant Kennedy has exposed the Company to significant liability under the federal securities laws by his disloyal acts.

307.    In the Securities Action, the Company is alleged to be liable to private persons, entities, and/or classes by virtue of many of the same facts alleged herein. If Tilray is found liable in the Securities Action for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Individual Defendants as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts.

308.    The Company is entitled to contribution and indemnification from these individuals in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

309.    As an officers and/or director of Tilray, defendant Kennedy had the power and ability to, and did, control or influence, either directly or indirectly, Tilray's general affairs, including the content of its public statements, and had the power and ability to directly or indirectly control or influence the specific corporate statements and conduct that violated section 10(b) of the Exchange Act, SEC Rule 10b-5, and other securities laws.

310.    Defendant Kennedy is liable under Section 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

311.    Defendant Kennedy accordingly has damaged the Company and is liable to the Company for contribution and/or indemnification.

312.    No adequate remedy at law exists for Plaintiff by and on behalf of the Company.

## COUNT II
### Breach of Fiduciary Duty
### Against the Former Directors

313.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

314.    The Former Directors, as former Tilray directors, owed the Company the fiduciary duties of due care, loyalty, good faith, candor, oversight, reasonable inquiry, and supervision.

315.    By virtue of their positions as Tilray directors, the Former Directors at all relevant times had the power to (and did) control, influence, and cause the Company to engage in the practices complained of herein, including the false and misleading statements alleged herein.

316.    Each Former Director was required to: (a) use his or her ability to control and manage Tilray in a fair, just, and equitable manner; and (b) act in furtherance of the best interests of Tilray rather than his or her own interests.

317.    By their acts alleged herein, including but not limited to causing Tilray to issue false and misleading statements while concealing material adverse information and failing to ensure that the Company maintained adequate internal controls regarding financial disclosures, the Former Directors each breached their fiduciary duties.

318.    The Former Directors acted in bad faith, willfully, and/or recklessly in violating their fiduciary duties owed to the Company.

319.    Tilray has been injured as a direct and proximate result of the Former Directors' wrongful conduct.

## COUNT III

**Breach of Fiduciary Duty
Against the Wrongful Refusal Defendants**

320.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

321.    The Wrongful Refusal Defendants owed and owe Tilray fiduciary obligations. By reason of their fiduciary relationships, the Wrongful Refusal Defendants specifically owed and owe Tilray the highest obligation of good faith, fair dealing, loyalty, and due care in the administration of the affairs of the Company.

322.    The Wrongful Refusal Defendants violated these fiduciary duties by failing to act independently, in good faith, and within the realm of sound business judgment in considering and responding to the Litigation Demand.

323.    As a direct and proximate result of the Wrongful Refusal Defendants' breaches of their fiduciary obligations, Tilray has sustained significant damages. Accordingly, the Wrongful Refusal Defendants are liable to the Company.

324.    Plaintiff, on behalf of Tilray, has no adequate remedy at law.

## COUNT IV

**Breach of Fiduciary Duty Through the Misappropriation of Material, Non-Public
Information Against Kennedy**

325.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

326.    At the time defendant Kennedy sold his personally-held Tilray stock, he knew the information described above and sold Tilray stock on the basis of such information.

327.    The information described above was proprietary, non-public information concerning the Company's financial condition and future business prospects. It was a proprietary

asset belonging to the Company, which defendant Kennedy misappropriated to his own benefit when he sold Tilray stock.

328.    Defendant Kennedy's sales of stock while in possession and control of this material, adverse, non-public information was a breach of his fiduciary duties of loyalty and good faith.

329.    Since the use of the Company's proprietary information for his own gain constitutes a breach of defendant Kennedy's fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits defendant Kennedy obtained thereby.

330.    Plaintiff, on behalf of Tilray, has no adequate remedy at law.

## COUNT V

### Unjust Enrichment
### Against the Individual Defendants

331.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

332.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Tilray.

333.    Plaintiff, as a shareholder and representative of Tilray, seeks restitution from the Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, salaries, benefits and other compensation obtained by these Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

81

B. Directing Tilray to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders holders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

C. Awarding to Tilray restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.

Dated: March 1, 2023                                  Respectfully submitted,

                                                               **POMERANTZ LLP**


                                                               */s/ Gustavo F. Bruckner*
                                                               Gustavo F. Bruckner
                                                               Samuel J. Adams
                                                               600 Third Avenue
                                                               New York, NY 10016
                                                               (212) 661-1100
                                                               gfbruckner@pomlaw.com
                                                               sjadams@pomlaw.com

**SHUMAN, GLENN & STECKER**
Rusty E. Glenn
600 17th Street, Suite 2800 South
Denver, CO 80202
(303) 861-3003
rusty@shumanlawfirm.com

**SHUMAN, GLENN & STECKER**
Brett D. Stecker
326 W. Lancaster Avenue
Ardmore, PA 19003
(303) 861-3003
brett@shumanlawfirm.com

*Attorneys for Plaintiff Michael Hudson*

I, Michael Hudson, hereby verify that I am familiar with the allegations in the Verified Stockholder Derivative Complaint and that I have authorized the filing of the Verified Stockholder Derivative Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: February 28, 2023

MICHAEL HUDSON